1 | Joseph H. Harrington
2 | United States Attorney
  | Eastern District of Washington
3 | George J.C. Jacobs III
  | Assistant United States Attorney
4 | Post Office Box 1494
  | Spokane, WA 99210-1494
5 | Telephone: (509) 353-2767

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

DEC 2 8 2018

SEAN F. McAVOY, CLERK
_____DEPUTY
RICHLAND, WASHINGTON

6

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | 4:18-CR-6044-EFS-2 |
| Plaintiff, | Plea Agreement |
| vs. | |
| DANIELLE CORINE MATA, | |
| Defendant. | |

Plaintiff, United States of America, by and through Joseph H. Harrington, United States Attorney for the Eastern District of Washington; George J.C. Jacobs, III, Assistant United States Attorney for the Eastern District of Washington; Defendant DANIELLE CORINE MATA; and Defendant's counsel, Nicholas Marchi, agree to the following Plea Agreement:

1. <u>Guilty Pleas and Maximum Statutory Penalties:</u>

Defendant, DANIELLE CORINE MATA, agrees to plead guilty to Count 1 of the Superseding Indictment filed on November 20, 2018, charging Defendant with conspiracy to commit the following offenses: (a) knowingly and intentionally distribute and dispense, and cause to be distributed and dispensed, quantities of controlled substances, including Fentanyl, Oxycodone, Methadone, Hydromorphone, Methylphenidate, Amphetamine mixture, all Schedule II controlled substances, and

Plea Agreement- 1

Carisoprodol and Alprazolam, all Schedule IV controlled substances, by issuing "prescriptions," and causing the issuing of "prescriptions," without a legitimate medical purpose and outside the usual course of professional practice, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), (b)(2), and 21 C.F.R. § 1306.04; all in violation of 21 U.S.C. § 846; and (b) knowingly and intentionally possess with intent to distribute and to dispense, quantities of controlled substances, including Fentanyl, Oxycodone, Methadone, Hydromorphone, Methylphenidate, and Amphetamine mixture, all Schedule II controlled substances, and Carisoprodol and Alprazolam, all Schedule IV controlled substances, in violation of 21, U.S.C. § 841(a)(1), (b)(1)(C), (b)(2), and 21 C.F.R. § 1306.04; all in violation of 21 U.S.C. § 846.

Defendant also agrees to plead guilty to Counts 4, 6, 18, 56, 57 and 64 of the Superseding Indictment filed on November 20, 2018, which charge Defendant with knowingly and intentionally distributing and dispensing, and causing to be distributed and dispensed, a mixture and substance containing a detectable amount of a Schedule II controlled substance, Oxycodone and Fentanyl, by issuing "prescriptions" without a legitimate medical purpose and outside the usual course of professional practice, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 846, 21 C.F.R. § 1306.04, and 18 U.S.C. § 2.

Defendant understands that Counts 1, 4, 6, 18, 56, 57 and 64 (all charging Schedule II controlled substances) are Class B felony offenses, which carry a maximum statutory penalty of: not more than a twenty-year term of imprisonment; a fine not to exceed $1,000,000; not less than a three-year nor more than a life term of supervised release; and a $100 special penalty assessment.  If Defendant has one or more prior felony drug convictions, and the United States files a Notice of Penalty Enhancement pursuant to 21 U.S.C. § 851, each offense would then carry a maximum statutory penalty of not more than a thirty-year term of imprisonment; not less than a six-year nor more than a life term of supervised release; a fine not to exceed $2,000,000 and a $100 special penalty assessment.

Plea Agreement- 2

Defendant understands that the Court has the authority to impose concurrent or consecutive sentences for each count of conviction. 18 U.S.C. § 3584. Defendant understands that if the Court imposes consecutive sentences, she would have to serve one after the other. *Id.*

Defendant understands that a violation of a condition of supervised release carries an additional penalty of re-imprisonment for all or part of the term of supervised release without credit for time previously served on post-release supervision.

2. Denial of Federal Benefits:

The Defendant understands that by entering her pleas of guilty the Defendant is no longer eligible for assistance under any state program funded under part A of title IV of the Social Securities Act (concerning Temporary Assistance for Needy Families) or benefits under the food stamp program or any state program carried out under the Food Stamp Act. 21 U.S.C. § 862a. Further, the Court may deny the Defendant's eligibility to any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States. 21 U.S.C. § 862.

3. The Court is Not a Party to the Agreement:

The Court is not a party to this Plea Agreement and may accept or reject it. Sentencing is a matter solely within the Court's discretion. Defendant understands the Court: 1) is under no obligation to accept any recommendations made by the United States and/or by the Defendant; 2) will obtain an independent report and sentencing recommendation from the U.S. Probation Office; and 3) may, in its discretion, impose any sentence it deems appropriate up to the statutory maximum penalties stated in the Plea Agreement.

Defendant acknowledges that no promises of any type have been made with respect to the sentence the Court will impose in this matter. Defendant understands

Plea Agreement- 3

the Court is required to consider the applicable sentencing guideline range, but may depart or vary upward or downward under the appropriate circumstances.

Defendant also understands that should the sentencing judge decide not to accept any of the parties' recommendations, that decision is not a basis for withdrawing from this Plea Agreement, or a basis for withdrawing her plea of guilty.

4. Waiver of Constitutional Rights:

Defendant understands that by pleading guilty, she is knowingly and voluntarily waiving certain constitutional rights, including:

(a) the right to a jury trial;

(b) the right to see, hear, and question the witnesses;

(c) the right to remain silent at trial;

(d) the right to testify at trial; and

(e) the right to compel witnesses to testify.

While Defendant is waiving certain constitutional rights, Defendant understands she retains the right to be assisted through the sentencing and any direct appeal of the conviction and sentence by an attorney, who will be appointed at no cost if Defendant cannot afford to hire an attorney. Defendant also acknowledges that any pretrial motions currently pending before the Court are waived.

5. Elements of the Offense:

The parties agree that, in order to convict Defendant of Conspiracy to Distribute or Dispense, or Cause to be Distributed or Dispensed Schedule II or Schedule IV controlled substances, without a legitimate medical purpose and outside the usual course of professional practice, and Aiding and Abetting in the Distribution or Dispensing of Schedule II controlled substances without a legitimate medical purpose and outside the usual course of professional practice, as charged in Counts 1, 4, 6, 18, 56, 57 and 64 of the Superseding Indictment, the United States would have to prove beyond a reasonable doubt the following elements:

//

Plea Agreement- 4

Count 1:

First, beginning on or about August 14, 2015, and continuing until on or about May 31, 2017, in the Eastern District of Washington, there was an agreement between two or more persons to commit the following offenses:

a) to knowingly and intentionally distribute or dispense, or cause to be distributed or dispensed, quantities of controlled substances, including Fentanyl, Oxycodone, Methadone, Hydromorphone, Methylphenidate, Amphetamine mixture, all Schedule II controlled substances, and Carisoprodol and Alprazolam, all Schedule IV controlled substances, by issuing "prescriptions," or causing the issuing of "prescriptions," without a legitimate medical purpose and outside the usual course of professional practice, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), (b)(2), and 21 C.F.R. § 1306.04; and,

b) to knowingly and intentionally possess with intent to distribute or to dispense, quantities of controlled substances, including Fentanyl, Oxycodone, Methadone, Hydromorphone, Methylphenidate, Amphetamine mixture, all Schedule II controlled substances, and Carisoprodol and Alprazolam, all Schedule IV controlled substances, in violation of 21, U.S.C. § 841(a)(1), (b)(1)(C), (b)(2), and 21 C.F.R. § 1306.04; and

Second, Defendant, DANIELLE CORINE MATA, became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

Counts 4, 6, 18, 56, 57 and 64:

First, on or about February 17, 2016 [Count 4], April 30, 2016 [Count 6], August 9, 2016 [Count 18], March 10, 2017 [Count 56], March 22, 2017 [Count 57], April 28, 2017 [Count 64], in the Eastern District of Washington, Defendant ARNOLD knowingly and intentionally distributed or dispensed, or

cause to be distributed or dispensed, a mixture or substance containing a detectable amount of a Schedule II controlled substance, 90 Oxycodone 20mg pills [Count 4], 120 Oxycodone 15mg pills [Count 6], 15 Fentanyl 100mcg patches [Counts 18 and 56], 15 Fentanyl 50mcg patches [Count 64], by issuing prescriptions without a legitimate medical purpose and outside the usual course of professional practice;

*Second*, Defendant MATA knowingly and intentionally aided, counseled, commanded, induced or procured Defendant ARNOLD to commit the crime of knowingly and intentionally distributing or dispensing, or causing to be distributed or dispensed, a mixture or substance containing a detectable amount of a Schedule II controlled substance 90 Oxycodone 20mg pills [Count 4], 120 Oxycodone 15mg pills [Count 6], 15 Fentanyl 100mcg patches [Counts 18 and 56], 150 Oxycodone 30mg pills [count 57], 15 Fentanyl 50mcg patches [Count 64], by issuing prescriptions without a legitimate medical purpose and outside the usual course of professional practice;

*Third,* Defendant MATA knew that it was a controlled substance; and

*Fourth,* Defendant MATA acted before the crime was completed.

6. Factual Basis and Statement of Facts:

The parties stipulate and agree that the United States could prove the following facts beyond a reasonable doubt at trial, and these facts constitute an adequate factual basis for Defendant's guilty plea. This statement of facts does not preclude either party from presenting and arguing, for sentencing purposes, additional facts which are relevant to the guideline computation or sentencing, unless otherwise prohibited in this agreement.

Defendant MATA conspired with Defendants JANET SUE ARNOLD aka "Nugget," JENNIFER CHERI PRICHARD, DAVID BARNES NAY ("NAY"), LISA MARIE COOPER and others to distribute or dispense, or cause to be distributed or dispensed, and to possess with the intent to distribute quantities of controlled

Plea Agreement- 6

substances including Fentanyl, Oxycodone, Methadone, Hydromorphone, Methylphenidate, Amphetamine mixture, all Schedule II controlled substances, and Carisoprodol and Alprazolam, all Schedule IV controlled substances, by issuing "prescriptions," or causing the issuing of "prescriptions," without a legitimate medical purpose and outside the usual course of professional practice. Beginning in and around March 2016, and continuing through on or about May 3, 2017, Defendants ARNOLD, MATA, PRICHARD, COOPER, and NAY worked together and with other individuals to distribute, and possess with intent to distribute, large amounts of highly addictive prescription drugs in and around Richland, Washington.

Defendant JANET SUE ARNOLD ("ARNOLD") owned and operated a medical clinic known as Desert Wind Family Practice ("DWFP"), located at 431 Wellsian Way, Richland, Washington 99352. DWFP was not licensed by the State of Washington as a pain management clinic. Defendant ARNOLD was a licensed physician who held a Washington medical license and Drug Enforcement Administration ("DEA") registration number. As such, Defendant ARNOLD was authorized to prescribe controlled substances for legitimate medical purposes and in the usual course of professional practice. An individual (identified herein by the initials "T.N.") acted as DWFP's receptionist until in or about March 2016. T.N. had no known medical background and was not licensed as any type of care provider by the State of Washington.

Beginning in or about March 2016, Defendant ARNOLD hired Defendant DANIELLE CORINE MATA ("MATA") to work as DWFP's receptionist and office manager. Defendant MATA worked at DWFP until on or about May 31, 2017, when the State of Washington summarily suspended Defendant ARNOLD's medical license. Defendant MATA was not licensed as any type of care provider by the State of Washington, and did not have a DEA registration number to prescribe controlled substances. Beginning in or about November 2016, Defendant ARNOLD hired Defendant JENNIFER CHERI PRICHARD ("PRICHARD") to work at DWFP.

Plea Agreement- 7

Defendant PRICHARD was not licensed as any type of care provider by the State of Washington, and did not have a DEA registration number to prescribe controlled substances.

At an exact date unknown, but at least by in or about March 2016 and continuing through on or about May 3, 2017, Defendant ARNOLD would pre-sign blank prescriptions and provide pre-signed blank prescriptions to Defendants MATA and PRICHARD to provide to individuals seeking Schedule II and Schedule IV controlled substances. At various times, Defendants MATA and PRICHARD would meet with Defendant ARNOLD at off-site locations where Defendant ARNOLD would pre-sign blank prescription paper to provide to individuals seeking Schedule II and Schedule IV controlled substances.

At an exact date unknown, but at least by in or about March 2016 and continuing through on or about May 3, 2017, Defendant ARNOLD would allow Defendant MATA, even though Defendant MATA was not trained or legally authorized to do so, to fill in all the required prescription information on blank prescriptions pre-signed by Defendant ARNOLD – to include patient name, drug type, dosage, and quantity – and Defendant ARNOLD would also allow Defendant MATA to provide the prescriptions to customers or patients. Defendant ARNOLD would sometimes pre-sign blank prescriptions without even knowing the identities of the customer to whom the prescriptions would be issued or the nature or dosage of the drug to be prescribed.

NAY used other individuals to obtain and fill prescriptions for controlled substances using prescriptions pre-signed by Defendant ARNOLD. NAY provided Defendant MATA with the name and other required information to use on the otherwise blank pre-signed prescriptions.

Defendant LISA MARIE COOPER ("COOPER") was a resident of Prosser, Washington. Defendant COOPER used other individuals to obtain and fill prescriptions for controlled substances using prescriptions pre-signed by Defendant ARNOLD.

The Controlled Substances Act, 21 U.S.C. § 841 et seq. ("CSA") governs the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it "unlawful for any person knowingly or intentionally … to manufacture, distribute, or dispense … a controlled substance." The CSA defines a "controlled substance" as a drug or other substance that is included in one of five schedules – Schedules I, II, III, IV, or V – of Subchapter I, Part B of the Act. 21 U.S.C. § 802(6). Drugs or substances are placed into these schedules based on their potential for abuse, among other reasons. "Schedule II" means that the drug or other substance has a currently accepted medical use with severe restrictions and has a high potential for abuse that can lead to severe psychological or physical dependence. 21 U.S.C. § 812(b)(2). "Schedule IV" means that the drug or other substance has a currently accepted medical use with a low potential for abuse relative to those listed in Schedule III and can lead to limited physical or psychological dependence. 21 U.S.C. § 812(b)(4).

"Fentanyl" is a generic name for a narcotic (opioid) analgesic. It is also sold as transdermal patches under the brand name Duragesic®. Transdermal fentanyl patches are designed to release a specific dose of fentanyl every hour for 72 hours (3 days). For example, a fentanyl 100mcg/hr patch will release 100mcg of fentanyl every hour for 72 hours. Fentanyl is classified under federal law as a Schedule II controlled substance. When legally prescribed for a legitimate medical purpose, fentanyl typically is used for the relief of moderate to severe long-term pain. Fentanyl can be extremely habit-forming. Fentanyl is to be prescribed only when medically required and is to be taken only in a manner prescribed by a doctor for a particular patient.

"Oxycodone" is a generic name for a narcotic (opioid) analgesic. It is also sold under the brand name Roxicodone®. Oxycodone is classified under federal law as a Schedule II controlled substance. When legally prescribed for a legitimate medical purpose, oxycodone typically is used for the relief of moderate to severe short-term pain. Oxycodone can be extremely habit-forming. Oxycodone is to be prescribed only

Plea Agreement- 9

when medically required and is to be taken only in a manner prescribed by a doctor for a particular patient.

"Methadone" is a generic name for a narcotic (opioid) analgesic. It is also sold under the brand name Methadose®. Methadone is classified under federal law as a Schedule II controlled substance. When legally prescribed for a legitimate medical purpose, methadone typically is used for the treatment of withdrawal symptoms in patients addicted to heroin and other narcotic drugs. Methadone can also be used as a pain reliever as part of a drug addiction detoxification and maintenance program. Methadone can be extremely habit-forming. Methadone is to be prescribed only when medically required and is to be taken only in a manner prescribed by a doctor for a particular patient.

"Hydromorphone" is a generic name for a narcotic (opioid) analgesic. It is also sold under the brand name Dilaudid®. Hydromorphone is classified under federal law as a Schedule II controlled substance. When legally prescribed for a legitimate medical purpose, hydromorphone typically is used for the relief of moderate to severe short-term pain. Hydromorphone can be extremely habit-forming. Hydromorphone is to be prescribed only when medically required and is to be taken only in a manner prescribed by a doctor for a particular patient.

"Methylphenidate" is a generic name for a stimulant. It is also sold under the brand name Ritalin®. Methylphenidate is classified under federal law as a Schedule II controlled substance. When legally prescribed for a legitimate medical purpose, methylphenidate typically is used for the treatment of Attention Deficit / Hyperactivity Disorder (ADHD), Attention Deficit Disorder (ADD), and/or narcolepsy. Methylphenidate can be extremely habit-forming. Methylphenidate is to be prescribed only when medically required and is to be taken only in a manner prescribed by a doctor for a particular patient.

"Amphetamine mixture" is a generic name for a stimulant. It is also sold under the brand name Adderall®. Amphetamine mixture is classified under federal law as a

Plea Agreement- 10

Schedule II controlled substance.  When legally prescribed for a legitimate medical purpose, amphetamine mixture typically is used for the treatment of Attention Deficit / Hyperactivity Disorder (ADHD) and/or narcolepsy.  Amphetamine mixture can be extremely habit-forming.  Amphetamine mixture is to be prescribed only when medically required and is to be taken only in a manner prescribed by a doctor for a particular patient.

"Carisoprodol" is a generic name for a muscle relaxer.  It is sold under the brand name Soma®.  Carisoprodol is classified under federal law as a Schedule IV controlled substance.  When legally prescribed for a legitimate medical purpose, carisoprodol typically is used for the treatment of acute, skeletal muscle conditions such as pain or injury.  Carisoprodol can be habit-forming.  Carisoprodol is to be prescribed only when medically required and is to be taken only in a manner prescribed by a doctor for a particular patient.

"Alprazolam" is a generic name for a sedative (benzodiazepine).  It is sold under the brand name Xanax®.  Alprazolam is classified under federal law as a Schedule IV controlled substance.  When legally prescribed for a legitimate medical purpose, alprazolam typically is used for the treatment of anxiety and panic disorders.  Alprazolam can be habit-forming.  Alprazolam is to be prescribed only when medically required and is to be taken only in a manner prescribed by a doctor for a particular patient.

Pursuant to 21 U.S.C. § 822(b) and 21 C.F.R. § 290.1, the controlled substances listed in Schedules II, III, IV, and V can be dispensed or distributed only by prescriptions by a practitioner registered with the DEA for that purpose. The DEA, as authorized by the CSA, issues registration numbers to qualifying medical practitioners that allow them to issue prescriptions for Schedule II, III, IV, and V controlled substances. Accordingly, controlled substances, such as opioid pain medications, can be dispensed only pursuant to a valid prescription from a medical practitioner authorized by the DEA to distribute controlled substances. 21 C.F.R. § 1306.03.

The term "practitioner" means a physician, medical doctor, dentist, or other person licensed, registered, or otherwise permitted by the United States or the jurisdiction in which he or she practiced, to distribute or dispense a controlled substance in the course of professional practice.  Defendant ARNOLD was a medical doctor licensed by the State of Washington Medical Board and considered a "practitioner" within the meaning of the CSA.

During the relevant period, an individual practitioner like Defendant ARNOLD who wanted to distribute or dispense controlled substances in the course of professional practice was required to register with the Attorney General of the United States ("Attorney General") before she was legally authorized to do so.  Such individual practitioners were assigned a registration number by the DEA.  Defendant ARNOLD was registered with the Attorney General and DEA under registration number FA2884561.

Practitioners registered with the Attorney General were authorized under the CSA to write prescriptions for, or to otherwise dispense, Schedule II, III, IV, and V controlled substances, so long as they complied with the requirements of their registrations. 21 U.S.C. § 822(b).  The CSA prohibited any person from knowingly and intentionally using a DEA registration number issued to another person in the course of distributing or dispensing a controlled substance.

For a medical doctor like Defendant ARNOLD, compliance with the terms of her registration meant that she could issue a prescription for a controlled substance to a patient only if the prescription was "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice." 21 C.F.R. § 1306.04(a).  A doctor violated the CSA and Code of Federal Regulations if he or she issued a prescription for a controlled substance outside the usual course of professional medical practice and not for a legitimate medical purpose.  Such knowing and intentional violations subjected the doctor to criminal liability under 21 U.S.C. § 841(a)

and 21 C.F.R. § 1306.04(a).  Pursuant to 21 C.F.R. § 1306.05(a) all prescriptions for controlled substances are required to be dated as of, and signed on, the day when issued.

The practitioner must first determine that a prescription for a controlled substance is for a legitimate medical purpose; then, the practitioner may authorize an agent to prepare the prescription and must instruct the agent as to the required elements of the prescription.  The CSA defines an "agent" as "an authorized person who acts on behalf of or at the direction of a manufacturer, distributor, or dispenser" 21 U.S.C. § 802(3).  The practitioner signs the prescription only after reviewing the prescription for accuracy.

Pursuant to 21 C.F.R. § 1306.12, the refilling of a prescription for a Schedule II controlled substance is prohibited.  However, a practitioner may issue multiple prescriptions authorizing a patient to receive a total of up to a 90-day supply of a Schedule II controlled substance if these and other conditions are met: (1) each separate prescription is issued for a legitimate medical purpose by a practitioner acting in the usual course of professional practice; (2) the practitioner provides written instructions on each prescription (other than the first prescription, if the prescribing practitioner intends for that prescription to be filled immediately) indicating the earliest date on which a pharmacy may fill each prescription; and (3) the practitioner concludes that providing the patient with multiple prescriptions in this manner does not create an undue risk of diversion or abuse.  21 C.F.R. § 1306.12(b)(1).

Defendant ARNOLD distributed and dispensed, and caused to be distributed and dispensed, Schedule II and Schedule IV controlled substances that were not prescribed for a legitimate medical purpose and not in the usual course of professional practice in the following non-exhaustive manners:

    a.  Conducting cursory, incomplete inadequate or no medical examination;

    b.  Collecting and reviewing inadequate patient medical history and follow-up verifications;

c. Conducting insufficient dialogue with the patient regarding treatment options and risks and benefits of such treatments;

d. Primarily treating patients with highly addictive controlled substances while failing to consider or prescribe other treatment options;

e. Prescribing highly addictive controlled substances despite inadequate diagnostic testing;

f. Prescribing highly addictive controlled substances to patients who complained of undocumented or uncorroborated physical ailments where lesser treatment options would be indicated;

g. Failing to assess the risk of abuse for individual customers;

h. Failing to monitor the patients' responses to the medication or compliance with medical usage;

i. Failing to query the Prescription Monitoring Program;

j. Failing to take a history of drug or alcohol abuse for individual patients;

k. Increasing the dosages and strength of Schedule II controlled substances without justification;

l. Failing to request records from prior providers or establishing why the purported patient changed providers;

m. Routinely pre-signing blank prescriptions and giving the blank pre-signed prescriptions to her office manager, receptionist, and other non-medical personnel.

DWFP patients received prescriptions for Schedule II and Schedule IV Controlled Substances, often without meeting with Defendant ARNOLD. These patients would be charged $20 to pick up a prescription. Patients were charged $80 to $120 for an appointment with Defendant ARNOLD.

The U.S. Drug Enforcement Administration, Seattle Tactical Diversion Squad (TDS) initiated a criminal investigation after receiving a complaint alleging Defendant ARNOLD prescribed painkillers to a patient without medical necessity and the patient

Plea Agreement- 14

1   sold the medications.  The Washington Prescription Monitoring Program (PMP)

2   confirmed Defendant ARNOLD prescribed large quantities of pain medications.

3   Defendant ARNOLD practiced at DWFP in Richland, Washington – a medical clinic

4   she ran with an individual identified herein as T.N., and subsequently with Defendants

5   MATA and PRICHARD.

6       During the investigation, DEA agents directed a Confidential Source (identified

7   herein as K.C.) to schedule medical appointments with Defendant ARNOLD and

8   request and obtain prescriptions for opioids, in particular Oxycodone.  Defendants

9   ARNOLD, MATA and PRICHARD conspired with each other, and aided and abetted

10  each other, in distributing Oxycodone to K.C. without a legitimate medical purpose

11  and outside the usual course of professional practice.

12      The DEA TDS investigation revealed that between March 22, 2016, and May 3,

13  2017, approximately 487 "prescriptions" (bearing Defendant ARNOLD's signature

14  and DEA Registration Number) were issued to individuals and filled for 1,997

15  Fentanyl patches, 630 Oxymorphone pills, 1,950 Hydromorphone pills, 27,199

16  Oxycodone pills, 6,680 Methadone pills, 1,740 Methylphenidate pills, 1,920

17  Amphetamine mixture pills, 7,098 Carisoprodol pills.

18      Defendant ARNOLD's practice of pre-signing blank prescription forms and

19  giving them to Defendants MATA and PRICHARD, non-physician employees at

20  DWFP, enabled the conspirators to distribute Schedule II and Schedule IV controlled

21  substances without a legitimate medical purpose and outside the usual course of

22  professional practice.  The conspirators issued prescriptions to individuals never

23  examined by Defendant ARNOLD or seen by her only a few times.  Defendant

24  ARNOLD would prescribe highly addictive controlled substances just because the

25  person requested them and would increase their dosage amounts just because the

26  patient requested it.  Defendant ARNOLD would prescribe highly addictive controlled

27  substances to some patients without checking their vital signs, taking a history of drug

28  or alcohol use, performing adequate physical examinations, establishing symptoms or

Plea Agreement- 15

1  making diagnoses to support drug treatments, or requesting records from prior

2  providers.  Defendant ARNOLD also fell below the standard of care by failing to

3  establish why the patient changed providers, failing to query the Prescription

4  Monitoring Program,[1] failing to establish justification for increasing dosages, failing

5  to establish a pain management agreement with the patient, failing to explain a reason

6  for early refilling of prescriptions, failing to order to toxicology testing, and failing to

7  make chart note of all visits.  Some chart notes record patients being seen, and/or

8  prescribed medications by T.N., who was employed as Defendant ARNOLD's

9  receptionist and was not licensed as any type of care provider by the State of

10  Washington.

11      At Defendants MATA and PRICHARD's request, Defendant ARNOLD would

12  sign multiple prescription forms in blank without even knowing the identities of some

13  of the individuals to whom the prescriptions would be issued or the nature or dosage

14  of the drug prescribed.  Defendant ARNOLD pre-signed blank prescription forms and

15  provided them to Defendants MATA and PRICHARD to use for distributing

16  controlled substances without a legitimate medical purpose and outside the usual

17  course of professional practice.  Defendant MATA, although not trained or legally

18  authorized to do so, filled in all the required prescription information – patient name,

19  drug type, dosage, and quantity – and provided the prescriptions to patients and non-

20  patients.  Defendant MATA occasionally put fabricated diagnosis codes on the

21  prescriptions.  Defendants MATA and PRICHARD often met with Defendant

22  ARNOLD at off-site locations for the purpose of obtaining pre-signed blank

23  prescriptions forms from Defendant ARNOLD, which were used by the conspirators

24  to distribute and dispense and caused to be distributed and dispensed, and to possess

25  with intent to distribute and dispense, Schedule II and Schedule IV controlled

26

27  [1] The Washington Prescription Monitoring Program (PMP) took effect on August 27, 2011, and was created to improve patient care and stop prescription drug misuse by collecting dispensing records for Schedule II, II, IV and V drugs and making the information available to medical providers and

28  pharmacists as a patient care tool.

1  substances.  Defendants ARNOLD and MATA and other co-conspirators would also
2  distribute some of the controlled substances obtained from the prescriptions among
3  themselves and other conspirators.  One or more individuals would call or text
4  Defendants ARNOLD and MATA and order whatever Schedule II or Schedule IV
5  controlled substances they wanted.

6      Defendant ARNOLD's pre-signing of blank prescription forms enabled several
7  conspirators to obtain Schedule II controlled substances to sell to others or trade for
8  other controlled substances.  Defendant MATA and conspirators, using pre-signed
9  blank prescription forms provided by conspirator Defendant ARNOLD, also issued
10  prescriptions in the names of individuals who were not even patients of Defendant
11  ARNOLD.  For example, NAY obtained from Defendants ARNOLD and MATA
12  prescriptions for Schedule II controlled substances for non-patient, P.S.  When
13  interviewed by DEA/HHS-OIG, P.S. stated that NAY asked P.S. if he could use P.S.'s
14  name and other personal information on prescriptions for controlled substances.
15  Between September 9, 2016, and December 1, 2016, P.S. filled 9 prescriptions bearing
16  Defendant ARNOLD's signature for 330 Carisoprodol 350mg pills, 30 Fentanyl
17  25mcg patches, 15 Fentanyl 50mcg patches, and 360 Oxycodone 15mg pills.  P.S.
18  never saw Defendant ARNOLD and was never her patient.  NAY transported P.S. to
19  pre-determined pharmacies and provided P.S. with money to cover the cost of the
20  filled prescription.  P.S. stated Defendant MATA and NAY contacted pharmacies in
21  advance to make sure they had the drug type and quantities available.  P.S. gave the
22  pills to NAY who distributed and sold the Schedule II controlled substances to other
23  individuals.

24      Defendant MATA initially started out as one of Defendant ARNOLD's patients
25  but in approximately March 2016, she became her office manager and one of her
26  trusted associates.  In June 2015, Defendant MATA sought treatment from Defendant
27  ARNOLD.  Defendant ARNOLD prescribed Defendant MATA Methadone 60
28  mg/day and Oxycodone 60mg/day, and Alprazolam 3mg/day at her first visit.

Plea Agreement- 17

However, according to Defendant MATA's PMP[2] report, she had been prescribed Methadone 30 mg/day, Oxycodone 20 mg/day, and Alprazolam 1 mg/day by prior medical providers. Another provider had previously prescribed Suboxone (which is a pharmacologic treatment of opiate use disorder) to Defendant MATA. Defendant ARNOLD did not confirm Defendant MATA's prior medication doses and did not make a chart entry justifying the doses she prescribed. Though there are vital signs noted in the chart, there is no chart note to indicate history, exam, assessment, or treatment plan. Defendant ARNOLD did not take a substance abuse history, assess the risk of opiate treatment, advise Defendant MATA on the risks of opiate and benzodiazepine treatment, establish an opiate treatment contract and treatment goals or order toxicology screening. Defendant MATA became further addicted to Schedule II controlled substances prescribed by Defendant ARNOLD. While under Defendant MATA's care, Defendant MATA began smoking Fentanyl patches.

DEA/HHS-OIG interviewed L.S. in August and September 2018. L.S. stated when he went to Defendant ARNOLD he was already addicted to Oxycodone. Another person recommended L.S. go to Defendant ARNOLD's clinic if he needed a prescription and described her as being "loose" when it came to prescribing controlled substances. L.S. stated the only reason he went to Defendant ARNOLD was to get a prescription. L.S. stated Defendant ARNOLD did some physical evaluation during the appointment but it was not nearly as in-depth as what he had experienced with other doctors. There was no examination table in her office. L.S. stated he received prescriptions for as many Oxycodone pills he could get Defendant ARNOLD to write and he was really "working" her. Eventually, L.S. suggested to Defendant MATA that she get a job working at Defendant ARNOLD's clinic so he could get his prescriptions quicker and would not have to sit around the clinic with all the "tweakers." Several times, L.S. went to DWFP and observed Defendant ARNOLD

---

[2] Prescription Monitoring Program.

Plea Agreement- 18

there, but he did not meet with her.  L.S. stated that Defendant MATA would print out his prescriptions, had Defendant ARNOLD sign them, and Defendant MATA gave the prescriptions to him.  L.S. never saw Defendant MATA sign Defendant ARNOLD's name on a prescription.  L.S. obtained prescriptions for Fentanyl patches and pills for S.B., filled them at a pharmacy, and delivered them to S.B.[3]  L.S. stated he did not need to receive additional pills from other individuals he picked up prescriptions for because he received a "pretty heavy prescription" from Defendant ARNOLD.  L.S. went in to drug withdrawal after Defendant ARNOLD's clinic was shut down.

Defendant ARNOLD prescribed highly-addictive controlled substances to an opiate addict, L.S.  Medical notes for L.S. indicate L.S. drank "1/5 whiskey and occ beer, cannabis weekly, no street drugs."  Defendant ARNOLD prescribed high-dose opiates (1,260 MEQ/day).[4]  Defendant ARNOLD did not review PMP information for L.S.  Had she done so, Defendant ARNOLD would have noted L.S. filled prescriptions from multiple opiate prescribers and had been previously treated with Suboxone film, which is used for pharmacologic management of opiate use disorder. Additionally, Defendant ARNOLD would have noted L.S. last filled prescription opiates on September 3, 2014, nearly one year prior to his first visit with Defendant ARNOLD (and, therefore, should have been considered opiate naïve).  Defendant ARNOLD did not document L.S.' prior opiate treatment history or gather information from past providers regarding the circumstances surrounding his departure from care or to confirm a prior opiate dose.  Defendant ARNOLD initiated transdermal Fentanyl patches to be changed every 2 days, though every 3-day dosing suffices for most patients and would have been a more appropriate starting dose.  This prescription would have allowed L.S. to overlap use of his Fentanyl patches or to divert the medication.  L.S. exhibited aberrant behavior around his opiate use.  He overused his

---

[3] After an initial visit on September 28, 2015, Defendant ARNOLD prescribed opiates for approximately nine months (9/28/15 – 6/23/16) without any follow up visits.
[4] MEQ means Morphine Equivalency.

Plea Agreement- 19

opiate medication as noted on August 28, 2015.  Defendant ARNOLD, however, doubled his Fentanyl dose on this date, only 16 days from a prior 30-day fill of Fentanyl.  Defendant ARNOLD documented an Oxycodone dose of 20mg twice daily with dispensation of 60 pills on August 11, 2015.  However, the prescription filled was for 120 pills and allowed up to 80mg/day of Oxycodone.  A prescription for Methadone 90mg/day from Defendant ARNOLD was filled on October 3, 2016, though there is no chart note documentation of this treatment.  On October 30, 2015, Defendant ARNOLD prescribed Methadone 90mg/day, in addition to L.S.' treatment with Hydromorphone 24 mg/day, which equated to 1,176 MEQ/day.  L.S.'s prior opiate dose was 336 MEQ/day (Fentanyl 100 mcg/hr plus Hydromorphone 24mg/day).  Defendant ARNOLD did not see L.S. again until April 27, 2016 (6 months later) though she continued to prescribe opiates in the interim.

Starting in approximately March 2016, L.S. began contacting Defendant MATA, who was now working for Defendant ARNOLD, to get his drugs.  Defendant ARNOLD gave Defendant MATA the authority to fill out the blank prescription forms Defendant ARNOLD pre-signed.  L.S. also contacted Defendant MATA to get prescriptions for Schedule II controlled substances for S.B., J.R., and P.B.

**October 9, 2015 - Prescription (30 Oxycodone 15mg)**

On October 9, 2015, DEA conducted a video-recorded controlled office appointment between K.C. and Defendant ARNOLD.  K.C. was posing as a new patient.  DEA gave K.C. $300 in Official Authorized Funds (OAF) to pay ARNOLD for the medical appointment.  K.C. entered DWFP, met with T.N., the receptionist, and filled out new patient paperwork.

Defendant ARNOLD took K.C. to her private office.  K.C. observed no medical equipment except a stethoscope on a wall behind Defendant ARNOLD's desk. Defendant ARNOLD asked K.C. if her appointment was for cannabis or medical. K.C. replied medical and stated she was there for "migraine headaches."  Defendant

Plea Agreement- 20

ARNOLD asked why K.C. thought the headaches were migraine.  K.C. replied her

friends told her.  Defendant ARNOLD asked why she did not have a local address.

K.C. stated she just moved to the Tri-Cities from Seattle to get away from an abusive

boyfriend, was sleeping on a friend's couch, and would have a local address by the

next visit.  Defendant ARNOLD asked K.C. for identification and the CS gave a

Washington identification.  Defendant ARNOLD typed on her computer and then

used an automated blood pressure cuff to take K.C.'s blood pressure.  When

Defendant ARNOLD told K.C. it was elevated, K.C. stated she consumed a Red Bull

energy drink.  Defendant ARNOLD lectured K.C. about the dangers of energy drinks

and asked K.C. what she took for headache pain.  K.C. replied, "Oxy 15s and 30s."

Defendant ARNOLD stated the 30s were a little high and printed a prescription on the

printer in her office.  Defendant ARNOLD asked K.C. where the headaches started

and progressed and motioned to various areas on her head.  Defendant ARNOLD

asked if the headaches started in the front and K.C. agreed.  Defendant ARNOLD

removed the stethoscope from the wall, listened to K.C.'s chest, and returned to her

desk.  According to the chart notes, Defendant ARNOLD assessed K.C. with

"probable tension headache."  She diagnosed K.C. with "Bilateral headache [ICD

784.0 and "elevated blood pressure reading [ICD 796.2]."  Defendant ARNOLD

removed a prescription for 30 Oxycodone 15mg tablets from her printer, signed it, and

gave it to K.C.  The prescription was dated October 9, 2015 and contained Defendant

ARNOLD's DEA Registration Number and State Licensing Number.  Defendant

ARNOLD told K.C. she prescribed this amount for 15 headaches a month (every other

day) and told K.C. she could take up to 2 pills per headache.  Defendant ARNOLD

stated it was an easy appointment and would only charge K.C. $150, instead of $200.

K.C. paid Defendant ARNOLD's receptionist, T.N., $150 in cash, and exited DWFP.

**November 6, 2015**

When K.C. arrived at DWFP for a scheduled appointment with Defendant

ARNOLD, the office was locked and there was a note on the door indicating

Plea Agreement- 21

Defendant ARNOLD was running late.  While waiting in the parking lot, K.C. conversed with Defendant MATA.  Defendant MATA gave K.C. the cell phone numbers for Defendants ARNOLD and MATA, and two other individuals (T.N. and A.M.).  Defendant MATA told K.C. she has known Defendant ARNOLD for approximately 8 years and knew about Defendant ARNOLD's prior discipline with the Washington Medical Board.  Defendant MATA told K.C. it was not uncommon for Defendant ARNOLD to not show up for work and related an incident where Defendant ARNOLD did not show up for one week, claiming she was catching up on her sleep.  K.C. asked Defendant MATA "If she doesn't show up, can I give you a call?  You know people, yeah?"  Defendant MATA replied, "yeah, what do you take? 15s, 30s, Oxys?"  Defendant MATA stated, "I know for a fact she wasn't here Wednesday, because [D.N.] came by and she wasn't there."  K.C. told Defendant MATA if Defendant ARNOLD "doesn't show up I'll give you a call, cause I'm going to need something."

**November 20, 2015**

When K.C. arrived at DWFP for a scheduled appointment with Defendant ARNOLD, the office was locked.  A note on the door indicated there was no electrical power.  K.C. observed Defendant MATA and other patients standing outside.  One individual talked about having paying Defendant ARNOLD $200 for an office visit however the pharmacy refused to fill the prescription she had written.  The individual stated when he contacted Defendant ARNOLD to fix it, Defendant ARNOLD "had me come in at like 7 or 8 o'clock at night [and] she asked me 'what do you want?  Just tell me what you want and I'll write it,' and I was like I don't know you're the fucking doctor."  Defendant MATA stated, Defendant ARNOLD was in the back drinking Mike's Hard Lemonade heavily on Monday.  Defendant MATA suggested K.C. go to another doctor in Pasco because that doctor is a "pain specialist" like Defendant ARNOLD, but that doctor is "better than her."  Defendant MATA stated [D.N.] "cuts her bud for her, and trims it."  Defendant MATA asked K.C. "Are you out of your

stuff too?  I've been out.  I can get you some.  [NAY] has scripts and he's going to get them filled, he has Oxys; he gets Fentanyl."  When Defendant MATA asked K.C. what she wanted, K.C. stated 15s or 30s.  Defendant MATA told K.C. that NAY can get pills for K.C.  K.C. also called T.N.'s cell phone, DWFP's receptionist, but it went to voicemail.

While meeting with DEA agents at a neutral location, K.C. exchanged text messages with Defendant MATA.  Defendant MATA texted K.C. that she contacted Defendant ARNOLD and told her there were six cash paying patients waiting to be seen if Defendant ARNOLD needed money to pay the electric bill.

**January 11, 2016**

When K.C. arrived at DWFP for a scheduled appointment with Defendant ARNOLD, the office was locked.  A note on the door stated: "Desert Wind Family Practice will be closed for regular visits for the whole month of December due to illness!  Text the doctor at [xxx-xxx]-9980 if you need a refill.  Text only ONCE.  Repeated requests will be ignored and will delay your Rx one additional week.  I will not be HOUNDED!  We will try to do prescriptions once a week and you will be contacted when you can pick up your Rxs."  A banner over the DWFP entrance read: "ACCEPTING NEW PATIENTS."

K.C. texted Defendant MATA about Defendant ARNOLD's status.  Defendant MATA replied that Defendant ARNOLD was out of the office Monday and Tuesday and would be back in on Wednesday.  K.C. asked Defendant MATA if she could arrange for K.C. to meet Defendant ARNOLD at another location.  Defendant MATA said she would ask Defendant ARNOLD.  At approximately 5:00 p.m., Defendant MATA texted K.C. she still had not heard from Defendant ARNOLD but she would be at Defendant ARNOLD's house on Tuesday, January 12, 2016, and would ask her again.  At approximately 8:30 p.m., K.C. texted Defendant MATA that Defendant ARNOLD missed the last three appointments K.C. had scheduled and K.C. would not

be available Wednesday for a prescription refill (in the event Defendant ARNOLD told Defendant MATA that K.C. could wait until Wednesday). Defendant MATA told K.C. she would ask Defendant ARNOLD to call K.C. on Wednesday so K.C. could tell Defendant ARNOLD what drugs and quantities she needed. Defendant MATA offered to pay Defendant ARNOLD the $20 refill fee on K.C.'s behalf.

**January 20, 2016**

When K.C. arrived at DWFP for a scheduled 1:00 p.m. appointment with Defendant ARNOLD, the office was locked. A note on the door stated DWFP was closed in December 2015 and provided a telephone number to call. K.C. sent a text message to Defendant ARNOLD asking when she would be in the office. At approximately 1:37 p.m., K.C. called Defendant MATA and notified her that Defendant ARNOLD was not at DWFP. Defendant MATA replied she would message Defendant ARNOLD to find out if she would be in the office. Defendant MATA said she was surprised Defendant ARNOLD did not show up for cash patients because she was broke. Defendant MATA told K.C. she wanted to take her to Defendant ARNOLD's house but did not want Defendant ARNOLD to get mad at her. Defendant MATA told K.C. that Defendant ARNOLD has big mood swings from being very nice to being very angry. Defendant MATA asked K.C. if there was something (referring to prescription medication) Defendant MATA could get for K.C. During their conversations throughout the day, K.C. told Defendant MATA she just wanted the drugs to sell.

**February 1, 2016 -- Prescription (60 Oxycodone 20mg)**

K.C. arrived at DWFP for her scheduled 4:30 p.m. appointment with Defendant ARNOLD. T.N. was at the reception desk. When K.C. eventually met with Defendant ARNOLD, Defendant ARNOLD asked K.C. if she had seen her before. K.C. said yes, but it was months ago and Defendant ARNOLD missed four previously scheduled appointments. While taking K.C.'s blood pressure, Defendant ARNOLD

Plea Agreement- 24

commented, "My God, you got enough tats" and asked if they were "prison tats."
Defendant ARNOLD told K.C. her blood pressure was "borderline." K.C. said it was
elevated because she drank a Red Bull energy drink.

Defendant ARNOLD asked K.C. how her pain has been on a scale of 1 to 10
over the last few weeks. K.C. replied 7. Defendant ARNOLD stated 7 was the same
number K.C. told her at her last appointment. Defendant ARNOLD asked if the
medication she prescribed last time helped. K.C. replied yes, when K.C. had it. K.C.
asked Defendant ARNOLD if she could get multiple prescriptions. Defendant
ARNOLD replied no, but K.C. could get 30 days at a time and would have to call in
for refills. Defendant ARNOLD told K.C. she would have to be seen every 3 months.
K.C. asked Defendant ARNOLD if she could get post-dated prescriptions. Defendant
ARNOLD replied no, that she used to do that, but patients would decide halfway into
it to change medications and then there were "all these scripts out there." K.C. asked
Defendant ARNOLD if there was a way to get more than before. Defendant
ARNOLD asked how many K.C. needed in a month. K.C. replied 120 a month.
Defendant stated, "Four a day? I gave you one a day. Are your headaches
escalating?" K.C. replied no. Defendant ARNOLD said she would give K.C. two
pills a day. K.C. asked if Defendant ARNOLD would increase the dosage strength.
Defendant ARNOLD asked why. K.C. replied that 15mg pills were not enough.
Defendant ARNOLD asked K.C. how effective the 15mg pills were. K.C. replied
about 50% effective. K.C. stated she was used to taking 30mg pills. Defendant
ARNOLD asked how K.C. was getting 30mg pills because Defendant ARNOLD
never prescribed them. K.C. stated she took two 15mg pills. Defendant ARNOLD
warned K.C. not to take two 15mg pills and added that Defendant ARNOLD would
fire her if K.C. did not behave. K.C. said, "Okay, okay. I'll behave. Hands up. Don't
fire me." Defendant ARNOLD said she would increase K.C.'s dosage to 20mg pills.
Defendant ARNOLD told K.C. that when K.C. took 2 pills, she built up a tolerance.
Defendant ARNOLD told K.C. about "rebound headaches" that could occur when a

Plea Agreement- 25

person takes medication on a regular basis and make the headaches worse.  Defendant
ARNOLD used the computer to print out a prescription for K.C. for 60 Oxycodone
20mg pills and gave K.C. the prescription.  The medical record for the visit indicated
Defendant ARNOLD "refused her dosage request, but have given her a modest
increase."  The prescription, dated February 1, 2016, bears Defendant ARNOLD's
signature, DEA Registration Number and State License Number.  Defendant
ARNOLD agreed to increase the quantity and strength from 30 Oxycodone 15mg pills
to 60 Oxycodone 20mg pills.  Defendant ARNOLD also gave K.C. her cell phone
number and told K.C. to send her a text message 3 or 4 days after running out of
Oxycodone and they would tell K.C. when she could pick up the refill prescription.
Defendant ARNOLD stated she could mail the prescription to Seattle if necessary.
K.C. paid T.N. $80 in U.S. Currency for the appointment and made an appointment
for February 22, 2016.

After K.C.'s February 1, 2016, appointment Defendant MATA arrived in
DWFP's parking lot.  Defendant MATA and K.C. moved to a corner of the lot and
K.C. walked to Defendant MATA's vehicle.  Defendant MATA told K.C. that an
individual identified herein as "J" stole her Xanax® and Adderall® and Defendant
ARNOLD fired J for it.  K.C. told Defendant MATA that Defendant ARNOLD would
not write K.C. multiple prescriptions but she increased the Oxycodone dose strength
and quantity.  K.C. asked if Defendant ARNOLD's reluctance was because she was a
new patient.  Defendant MATA stated it took a while for her to be trusted with
Defendant ARNOLD because Defendant ARNOLD had been burned so many times.
Defendant MATA believed Defendant ARNOLD was presently being cautious.
Defendant MATA stated that Defendant ARNOLD would be more relaxed with K.C.
as she got to know her.

**February 17, 2016 -- Prescription (90 Oxycodone 20mg)**

At approximately 1:47 p.m., K.C. arrived at DWFP for her scheduled 3:00 p.m. appointment with Defendant ARNOLD. T.N. checked-in K.C. for her appointment. K.C. called Defendant MATA to let her know she was at DWFP. Defendant MATA text messaged K.C. notifying her that she would be at the clinic shortly. When Defendant MATA arrived at DWFP's parking lot, she met with K.C. Defendant MATA explained to K.C. that she had to add diagnosis codes to K.C.'s prescription, as well as her own and another patient's, because Defendant ARNOLD had not included the codes. Defendant MATA stated the law changed in the past month requiring diagnosis codes and the pharmacy would delay filling prescriptions without the codes. Defendant MATA stated Defendant ARNOLD had been "robbed blind" so many times that it takes her a long time to trust people and to "up" their prescriptions.

Defendant MATA and K.C. entered DWFP and waited in a private room to see Defendant ARNOLD. When Defendant ARNOLD saw Defendant MATA, she asked if Defendant MATA "needed something." Defendant ARNOLD went to the reception desk, retrieved a piece of paper, and gave it to Defendant MATA. Defendant MATA filled out the form at the reception desk and then returned to the private room until she met with Defendant ARNOLD.

Before K.C.'s meeting with Defendant ARNOLD, Defendant MATA asked Defendant ARNOLD to increase K.C.'s medications. Defendant ARNOLD told Defendant MATA she would do it. When Defendant MATA met with Defendant ARNOLD, she asked Defendant ARNOLD to increase the dosage strength and quantity of Oxycodone pills for K.C. Defendant ARNOLD agreed to do so. K.C. then met with Defendant ARNOLD and thanked Defendant ARNOLD for talking with Defendant MATA about her. Defendant ARNOLD stated Defendant MATA was actually a patient and "sort of friend" but did not work for Defendant ARNOLD. Defendant ARNOLD said Defendant MATA just did her favors. Defendant ARNOLD issued K.C. a prescription, dated February 17, 2016, for 90 Oxycodone 20mg pills. The prescription was issued without a legitimate medical purpose and

Plea Agreement- 27

outside the usual course of professional practice. The prescription bore Defendant ARNOLD's signature, DEA Registration Number and State Licensing Number. Defendant ARNOLD asked if K.C. had insurance. K.C. said no, she had cash. Defendant ARNOLD said it made no difference because she liked cash. K.C. paid $80 for the appointment with Defendant ARNOLD. K.C. also gave Defendant MATA $20.

At approximately 6:00 p.m., K.C. exited DWFP and met with DEA agents at a neutral location. K.C. gave the agents the prescription Defendant ARNOLD issued to her. K.C. stated that during her appointment, Defendant ARNOLD asked K.C. what she needed. K.C. asked Defendant ARNOLD to increase the quantity of Oxycodone pills to 90 from 60 and she agreed to do so.

**March 2, 2016 – (90 Oxycodone 20mg)**

At approximately 2:46 p.m., K.C. arrived at DWFP for her scheduled 2:30 p.m. appointment with Defendant ARNOLD. At approximately 3:28 p.m., K.C. submitted a refill request to T.N., in lieu of an appointment. At approximately 3:55 p.m., K.C. met Defendant MATA in DWFP's parking lot. At approximately 4:02 p.m., K.C. and Defendant MATA entered the clinic and waited in a private room adjacent to the waiting room until K.C. was called to the front desk. T.N. gave K.C. a prescription issued by Defendant ARNOLD, dated March 2, 2016, for 90 Oxycodone 20mg pills. K.C. did not see Defendant ARNOLD. The prescription was issued without a legitimate medical purpose and outside the usual course of professional practice. K.C. paid T.N. $20 for the prescription. Defendant MATA and K.C. spoke in the parking lot. K.C. met with DEA agents at a neutral location and gave them the prescription.

**April 1, 2016**

At approximately 4:00 p.m. on April 1, 2016, K.C. arrived at the Wild Horse Resort and Casino in Pendleton, Oregon for a pre-planned "Girls' Night Out" with Defendants MATA and ARNOLD. Defendant ARNOLD cancelled at the last minute

Plea Agreement- 28

but Defendant MATA did not. At approximately 4:51 p.m., Defendant MATA texted K.C.:

> I got called this morning to go cover office and Janet would be in late. I was slammed so I told her to contact you. She never showed to work nor is she answering my calls. The office was full of crack heads and it was just a horrible day. Janet let me know this morning she won't or can't go till next weekend and I told her she was calling you because I wasn't going to do that. Are you in area to talk?
>
> I'm just walking in door. I'm just fuming pissed right now … I texted her called her and I have millions of scripts that need a signature.

Defendant MATA also called K.C. and said Defendant ARNOLD was excited about the Pendleton trip but something changed between Defendant ARNOLD and T.N. that caused her to cancel. Defendant MATA stated she would bring K.C.'s prescription and could even "up it." At approximately 6:26 p.m., Defendant MATA text messaged K.C., "stopping to get your script." At approximately 6:35 p.m., during a cell phone conversation, Defendant MATA told K.C. she had to stop at Defendant ARNOLD's office to pick up K.C.'s prescription. Defendant MATA further stated that even though Defendant ARNOLD gave Defendant MATA permission to sign Defendant ARNOLD's name on prescriptions, Defendant MATA did not want to do it on K.C.'s prescriptions because Defendant ARNOLD's signature was difficult to copy. Defendant MATA told K.C. she would bring an example of Defendant ARNOLD's signature for K.C. to use to forge Defendant ARNOLD's signature. Defendant MATA said if anything happened, Defendant MATA would claim she signed the prescriptions. K.C. asked Defendant MATA if she would increase the quantity of the prescriptions. Defendant MATA asked K.C. if it would be okay if she printed out two prescriptions instead of increasing the quantity. Defendant MATA stated she answered the phone at Defendant ARNOLD's office and could screen pharmacies calling to verify. At approximately 7:48 p.m., Defendant MATA notified K.C. she had printed out K.C.'s prescriptions but had to stop at her house to get her

Plea Agreement- 29

Fentanyl patches.  Defendant MATA said she had a hard time finding a paper with Defendant ARNOLD's signature to photocopy.

When Defendant MATA arrived at the casino, she discussed plans to create a prescription forgery ring with K.C.  Defendant ARNOLD had fired T.N. as receptionist, and hired Defendant MATA in his place.  Defendant MATA explained that she logged into DWFP's computer as Defendant ARNOLD, so if Defendant ARNOLD ever looked up a prescription, Defendant ARNOLD would think she prescribed it.  Defendant MATA suggested K.C. get prescriptions for different medications to make money.  Defendant MATA also suggested K.C. find a person who can get Fentanyl patches because they sell for $150 a patch on the street. Defendant MATA discussed methods for printing prescriptions without entering the patient into the DWFP computer.  They also discussed K.C. texting Defendant MATA "patient" information and Defendant MATA could mail the prescriptions to K.C. Defendant MATA told K.C. this could be a huge moneymaker for them until DWFP was shut down.  Defendant MATA told K.C. her goal was to make $5,000 in 6 months for a house down payment.  Defendant MATA suggested K.C. tell Defendant ARNOLD that K.C. was involved in a car accident and had neck pain that caused the headaches.  Defendant MATA said this would allow Defendant ARNOLD to prescribe K.C. larger doses of pain medication.  Defendant MATA told K.C. that Defendant ARNOLD may order an MRI but would soon forget it.  Defendant MATA stated Defendant ARNOLD would initially prescribe K.C. Fentanyl 25mcg patches and quickly increase to 50mcg or 75mcg patches the next visit.  Defendant MATA said all the money was in Fentanyl patches because people were mixing the patches with heroin on the street.  Defendant MATA joked with K.C. that they could make news later after they were busted.  Defendant MATA compared herself and K.C. to "Thelma and Louise" and said they "hit the jackpot with script pads."  Defendant MATA stated she sensed K.C. was careful about her activity and was the only person Defendant MATA trusted to do this.  Defendant MATA told K.C. she believed she

Plea Agreement- 30

(MATA) was made to be a criminal but just did not have the proper criminal training. Defendant MATA explained to K.C. how applying a Fentanyl patch to her leg would make her more addicted because it would be on 24/7 instead of putting a patch in her mouth, which you can remove. Defendant MATA said Defendant ARNOLD wanted to pay her $10/hour for working at DWFP.

Defendant MATA told K.C., "every day she [ARNOLD] works, now that I work with her, every day she works she's pulling in $1300, $1400 cash without billing insurance. That's refills, that's … a bunch of refills … it's against the law to do $20 …."[5] Defendant MATA stated she was going to "start reaching out at Hanford to try and get new client business that's not so …." K.C. interjected "Fucked up" and Defendant MATA replied "Mmhmm." Defendant MATA stated that, "90% of the people at [DWFP] don't need the drugs they're taking." She also told K.C., "I do need my medicine, but I do abuse it sometimes." Defendant MATA told K.C. that her friend "Lisa" sells pills all over." Elsewhere, Defendant MATA stated, "I'm the one catching a felony" and she [ARNOLD] left me the practice to come and write scripts with people" and "she does it in stacks for me. You know how much money that is?" Defendant MATA also stated, "If doc would just get on board with us . . . and I think she turns a blind eye a little bit."

Defendant MATA brought K.C. two unsigned prescriptions for 90 oxycodone 20mg pills and a sample of defendant ARNOLD's signature for K.C. to use to forge her signature. Defendant MATA and K.C. discussed splitting the proceeds from selling prescriptions.

**April 30, 2016 – Prescription (120 Oxycodone 15 mg pills)**

On April 29, 2016, from 1:22 p.m. to 4:27 p.m., Defendant COOPER and Defendant MATA had the following text message exchange:

---

[5] 21 C.F.R. § 1306.12(a) prohibits refilling a prescription for a Schedule II controlled substance. Thus, a new prescription had to be issued if continued use of a Schedule II controlled substance was medically appropriate.

COOPER: I need to get … [C.C.'s] scripts he gets 75 MCR patch #15 and oxycodone 20mg. He get #120 he needs #180. And Adderal 30mg #30, and adderal 10mg #30.

COOPER: Also [K.M.] oxycodone 15mg ##120

COOPER: Can you help me on these

MATA: I'm slammed call you shortly

COOPER: Ok can you put those scripts t[h]rough

MATA: Yea. I just got a second finally

COOPER: That's good

COOPER: I need 5 of the 25s

COOPER: Can I get some ox from you I don't have enough to last me.

On April 30, 2016, at approximately 3:53 p.m., Defendant MATA and Defendant COOPER met in person and discussed buying and selling "patches" and "oxy." Defendant COOPER stated that she only had $40 extra with her and that part of the money belonged to C.C. Defendant MATA asked Defendant COOPER if she would be upset if she charged Defendant COOPER for them. Defendant COOPER stated she understood Defendant MATA was broke and needed money. Defendant MATA stated she would receive 180 "30's" next week and would pay Defendant COOPER back with those.

On April 30, 2016, from 5:23 p.m. to 6:31 p.m., Defendant COOPER and Defendant MATA had the following text message exchange:

MATA: How long before you come back?

MATA: …Heading back to office.

MATA: I'm not planning on staying here forever. I do not get paid for this. Lol

COOPER: Then why are you doing it

Plea Agreement- 32

MATA: Do you want meds??  I know of do and many others that do.  My plan wasn't to be working all day here anyhow

MATA: I'm waiting on you.  I want to leave

COOPER: Go ahead and go I am waiting for two people I can come by your house later

On May 2, 2016, Elfers-Lyon Pharmacy in Prosser, Washington, filled a prescription from DWFP, signed by Defendant ARNOLD, and dated April 30, 2016, for K.M. for 120 Oxycodone 15mg pills.  The prescription was issued without a legitimate medical purpose and outside the usual course of professional practice.

**June 20, 2016**

On June 20, 2016, K.C. arrived at DWFP for a scheduled appointment with Defendant ARNOLD.  K.C. contacted Defendant MATA and learned that Defendant ARNOLD never showed up at the office that day.  K.C. learned that Defendant MATA had been providing prescriptions for Oxycodone and Fentanyl patches to an individual identified herein as K.M.  DEA learned that Defendant COOPER was at a pharmacy trying to fill the prescription and had faxed a confirmation request to Defendant ARNOLD.  Defendant MATA was upset because all faxes went directly to Defendant ARNOLD's personal laptop.  Defendant MATA believed Defendant ARNOLD would now distrust Defendant MATA because Defendant ARNOLD never authorized the prescription.  Defendant MATA told Defendant COOPER she would contact the pharmacy.  Before doing so, Defendant COOPER contacted Defendant MATA and said everything was okay.  Defendant MATA suspected Defendant COOPER was trying to "cut out" Defendant MATA from their kick-back arrangement.  Defendant MATA told K.C. she was owed Oxycodone pills and Fentanyl patches for providing the prescription.

Defendant MATA showed K.C. a stack of pre-signed prescriptions from Defendant ARNOLD.  Defendant MATA explained that Defendant ARNOLD pre-

Plea Agreement- 33

signed a stack of prescriptions for Defendant MATA to use for patient medications. Defendant MATA printed out four prescriptions for K.C. for 180 oxycodone 30mg pills and six prescriptions for K.C.'s friend (fictitious name – Rhonda Adams) for 180 oxycodone 30mg pills.   Defendant MATA used the computer at the reception desk to print out the prescriptions.  Defendant MATA instructed K.C. to call her before filling the prescriptions to ensure Defendant MATA would be at DWFP to answer any pharmacy call.  K.C. paid Defendant MATA $200 as a down payment for the prescriptions.

Defendant MATA logged into DWFP's computer and showed K.C. how Defendant MATA would change prescriptions or add patients for the purpose of creating prescriptions.  Defendant MATA showed K.C. how this was done when creating a new prescription for K.C. for 180 Oxycodone 30mg tablets (Defendant ARNOLD previously authorized 90 Oxycodone 20mg pills) and changing K.C.'s diagnosis from headache to Crohn's Disease to justify the increase.  On September 9, 2016, Defendant MATA told K.C. that DWFP's new office assistant (Defendant PRICHARD) was a drug addict.

**August 9, 2016 – Prescription (15 Fentanyl 100mcg patches)**

On August 9, 2016, from 10:35 a.m. to 6:42 p.m., Defendant MATA and NAY had the following text message exchange:

MATA: We do [N.L.] today?  Later

NAY: Yes I'm ready

MATA: Around 2ish when doc isn't in town. What does he get?

MATA: What mg for [N.L.] for everything?

NAY: 100mcg 20mg 1mg xanex soma

NAY I can't get ahold of you, just hit me up when you're ready.

MATA: I told you it would be a bit.  Im going to office in few

MATA: He dont get xanax.

NAY: Hit me when your ready

MATA: Don't forget the somas please

MATA: I owe lisa [Defendant Lisa COOPER] some and she is waiting for them

NAY: Couldn't get the Soma cause they taxing me heavy. It was $257.10 for the other two. And they saying $306.47 with the soma. I didn't have enough money anyways cause I only had $260 and thought that was enough.

On August 9, 2016, at approximately 9:21 p.m., Defendant COOPER called Defendant MATA. Defendant MATA explained that NAY was unable to pick up the Soma® prescription. Defendant MATA was upset because she offered to give money to NAY to pay for the Soma® but he said that he had enough. NAY did not call Defendant MATA until after the pharmacy had closed to notify her he did not have enough money for the Soma®. Defendant MATA stated that when she told NAY that she was done doing deals with him, NAY ripped up the Soma® prescription. Defendant MATA was angry because she took the time to go into the office to print the Soma® prescription and NAY did not contact her until 20 minutes after the pharmacy closed to tell her that he did not have enough money to pay for it. Defendant MATA stated that NAY tried to blame K.Y who he sent in to pick up the prescription because N.L. was in jail. Defendant MATA stated that K.Y. and N.L. live next to NAY. Defendant MATA told Defendant COOPER that NAY kept all of N.L.'s prescriptions except for one third that Defendant MATA received. Defendant MATA stated that NAY always gets N.L.'s prescriptions.

On August 9, 2016, Shopko Pharmacy in Prosser, Washington, filled a prescription from DWFP, signed by Defendant ARNOLD, and dated August 9, 2016,

for N.L. for 15 fentanyl 100mcg patches.  The prescription was issued without a legitimate medical purpose and outside the usual course of professional practice.

**October 7, 2016**

K.C. gave Defendant MATA $200[6] as payment for expediting K.C.'s appointment with Defendant ARNOLD and as "drug proceeds" from prescriptions for Oxycodone provided in a prior visit.  During her medical appointment, Defendant ARNOLD asked K.C. if there was anything new.  K.C. replied no.  Defendant ARNOLD asked what K.C.'s average pain score with medication was.  K.C. replied that without medication, the pain was 7 or 8 and with medication it was a lot better.  Defendant ARNOLD and K.C. laughed.  Defendant ARNOLD stated she needed a number.  K.C. stated 3 or 4.  Defendant ARNOLD applied an automated blood pressure cuff to K.C. and exclaimed, "123!  How much caffeine have you had today?"  K.C. reminded Defendant ARNOLD that she drank Red Bull energy drinks.  Defendant ARNOLD stated, "You drank more than usual!  123?  That's pathologic!"  K.C. blamed it on a boring drive, cigarettes and caffeine.  Defendant ARNOLD asked how often K.C. was in the area and K.C. replied that she traveled back and forth.

Defendant ARNOLD asked K.C. if K.C. felt like her pain was pretty well controlled and K.C. replied yes.  K.C. asked if Defendant ARNOLD was willing to give K.C. more medication.  Defendant ARNOLD replied, "Only if you really need it."  K.C. said she would run out of medication.  Defendant ARNOLD offered K.C. 4 pills a day instead of the current 3 pills.  K.C. stated that was good.

Defendant ARNOLD asked K.C. how many days per month K.C. was having headaches.  K.C. and Defendant ARNOLD both stated "every day."  Defendant ARNOLD asked K.C. if she had a headache right now.  K.C. replied, "A little bit," but it may be from the long drive from Seattle.

---

[6] DEA Official Authorized Funds.

Plea Agreement- 36

Defendant ARNOLD printed a prescription, hand wrote a diagnosis code on it, and handed it to K.C. The prescription was on pre-signed paper. K.C. asked for another prescription for next month and Defendant ARNOLD said okay. Defendant ARNOLD printed the second prescription, added the diagnosis code, and handed it to K.C. This prescription was on pre-signed paper. Defendant ARNOLD charged K.C. $120 and told her to pay at the reception desk. K.C. paid $120 in cash.

**March 8-10, 2017**

From March 8, 2017, at 10:35a.m. to March 9, at 4:20 p.m., Defendant MATA and Defendant COOPER had the following text message exchange:

> COOPER: So one of the times you are at the office can you print [C.C.] out please. I can give you a couple of these 25s for doing it.

> COOPER: Did you print his scripts when you were at the office

> MATA: Sorry at hospital. Grandma took turn for worse. I stopped by office for 2 min yesterday.

> COOPER: … Can you please do [C.C.'s] 100MCR patches and his 20 mg. OXY. I can hook you up for doing it. Or give you some cash. Now you no why I asked for it the other day. Because I had a gut feeling it was going to difficult to get.

On March 10, 2017, from 10:18 a.m. to 1:23 p.m., Defendant MATA and Defendant COOPER had the following text message exchange:

> COOPER: What time are you going to work

> MATA: Not 100% sure. Going to see grandma first and play by ear

> MATA: We are meeting grandma specialist at 2ish then I will go

> COOPER: Ok thanks

> MATA: I may be there on time. Just depending

> MATA: I will text ya

COOPER: Ok

On March 10, 2017, text messages between Defendants MATA, ARNOLD, and PRICHARD confirmed that Defendant ARNOLD would not be at DWFP and that Defendants MATA and PRICHARD would be in the office handing out prescriptions using prescription paper pre-signed by Defendant ARNOLD. Defendant ARNOLD arranged to meet with Defendants MATA and PRICHARD in a veterinary parking lot to pre-sign more blank prescription paper.

On March 10, 2017, Shopko Pharmacy in Prosser, Washington, filled a prescription from DWFP, signed by Defendant ARNOLD, and dated March 10, 2017, for C.C. for 15 fentanyl 100mcg patches. The prescription was issued without a legitimate medical purpose and outside the usual course of professional practice.

On March 10, 2017, from 10:49 p.m. to 10:51 p.m., Defendant MATA sent Defendant COOPER the following text messages:

MATA: She can buy 2

MATA: She got the money

**March 22, 2017**

Defendant MATA sent a text message to K.C., "Doc just canceled!" and told K.C. to "park in the back." K.C. entered DWFP through the back door. K.C. met with Defendant MATA in Defendant ARNOLD's office. K.C. asked Defendant MATA who the girl in the back room was. Defendant MATA replied it was Defendant PRICHARD, her "best friend" who "does U/As" and was "just here with me." A few minutes later, Defendant PRICHARD entered Defendant ARNOLD's office and Defendant MATA introduced her to K.C. Defendant PRICHARD checked prescription paper in the printer. Another person, L.S., entered and expressed concern that Defendant ARNOLD would "flake out" one day and disappear. Defendant MATA replied, "she would show up and be 'Dr. Danielle Arnold.'" L.S. laughed and said Defendant MATA should have Defendant ARNOLD pre-sign many prescriptions

Plea Agreement- 38

or learn how to forge Defendant ARNOLD's signature.  Defendant MATA stated she would never sign Defendant ARNOLD's name but would go to Defendant ARNOLD's house to get signatures.

L.S. told Defendant MATA he wanted to "try those things that [S.B.] blah, blah, blah." L.S. "wanted to know what the fuss is all about." Defendant MATA told L.S. she did not think he would like them because he liked to be awake and going all the time. L.S. replied he liked to be going all the time and could not even take Xanax® (alprazolam, a Schedule IV controlled substance). Defendant MATA exclaimed, "Well, what the fuck do you think Soma's going to do!" L.S. stated he had no idea because he never tried it. Defendant MATA stated that if you go to bed at night, it (Soma) helps. L.S. replied that he had "1,000 pounds of weed … if I needed to sleep." Defendant PRICHARD was trying to figure out the correct position of the pre-signed prescription paper in the printer. Defendants MATA and PRICHARD, and L.S. discussed how to correctly position the paper in the printer.

L.S. asked Defendant MATA to make sure she did the "right quantity on those 30's because she (Defendant ARNOLD) accidentally changed them to 120." L.S. stated he "told her (Defendant ARNOLD) to go back to 150." The term "30's" is street slang and often refers to Oxycodone 30mg pills. Defendant PRICHARD told Defendant MATA "there are four pieces of paper there that are signed" and she took out some so there are not many left.

Defendant MATA said she "wanted to choke doc right now" because she was so mad. Defendant PRICHARD added that Defendant ARNOLD needed to come in tomorrow because there was not a lot of paper (pre-signed prescriptions). Defendant MATA asked Defendant PRICHARD, "How much total do we have in paper?" Defendant PRICHARD replied, "I think there is ten pieces in there... in your printer." K.C. asked Defendant MATA if she could create 10 prescriptions. Defendant MATA replied no because she did not have enough paper. K.C. asked if Defendant MATA

could create 5 prescriptions.  Defendant MATA said no because L.S. was 4 and she (MATA) was 5.  K.C. asked how many Defendant MATA could do.  Defendant MATA replied 3.  K.C. asked if Defendant ARNOLD was out of prescription paper. Defendant MATA replied that it was not about paper but rather "pre-signed paper." Defendant PRICHARD said they had a lot of unsigned paper.

Defendant MATA gave 2 prescriptions to K.C. who paid Defendant MATA $200 in cash.  Each prescription was for 150 Oxycodone 30mg pills.  They were dated March 22, 2017, and bore Defendant ARNOLD's signature.  The prescriptions were issued without a legitimate medical purpose and outside the usual course of professional practice.  Defendant MATA then said, "[L.S.], I'm doing yours now." K.C. went into Defendant ARNOLD's office with Defendant PRICHARD to make another appointment.  Defendant MATA called L.S. over to her and asked him what he wanted.  L.S. began telling Defendant MATA the drugs and quantities he wanted. L.S. could be heard saying, "oxycodone 150 and methadone 270."  K.C. departed.

DEA checked the PMP and confirmed L.S. filled two prescriptions dated March 22, 2017, one for 270 Methadone 10mg pills and the other for 150 Oxycodone 30mg pills.  Defendant MATA filled two prescriptions dated March 22, 2017, one for 90 Dextroamphetamine (Adderall®) 20mg pills and the other for Carisoprodol (Soma®) 350mg pills. The prescriptions were issued without a legitimate medical purpose and outside the usual course of professional practice.

**April 28, 2017 – Prescription (15 Fentanyl 50mcg patches)**

On April 27, 2017, at approximately 1:25 p.m., Defendant MATA sent a text message to Defendant ARNOLD, "Nugget, [D.N.] is over that way.  Im going to have him grab key for me.  I slept in and need to get to office.  Do not bring up to [D.N.] any personal stuff I share with you, please.  He is bringing me key [since] mine is in office."  At approximately 2:02 p.m., Defendant ARNOLD sent a text message to

Defendant MATA, "[D.N.] has key.  Sorry, I was sleeping. Of course I wouldn't share your personal stuff with [D.N.].

On April 28, 2017, at approximately 1:34 p.m., Defendant ARNOLD sent a text message to Defendant MATA, "Im not awake. [T.N.]'s not awake. Can you handle today?"  At approximately 1:40pm, Defendant MATA replied, "Yes. I need paper signed."  Defendant ARNOLD immediately replied, "Ok."

On April 28, 2017, Shopko Pharmacy in Prosser, Washington, filled a prescription from DWFP, signed by Defendant ARNOLD, and dated April 28, 2017, for R.S. for 15 fentanyl 50mcg patches.  The prescription was issued without a legitimate medical purpose and outside the usual course of professional practice.  On June 27, 2016, NAY had sent a text message to Defendant MATA with R.S.'s personal information to use to create a prescription and suggested he start with 180 Oxycodone 10mg pills and Fentanyl 50mcg patches.

**May 3, 2017 – Search Warrant at DWFP**

On May 3, 2017, DEA executed a warrant to search DWFP.  Defendants ARNOLD, MATA, PRICHARD were present.  T.N. (in a wheel chair) was present. Agents seized 35 blank, Defendant ARNOLD pre-signed prescriptions in six locations in the office.  Agents also seized 26 blank, Defendant ARNOLD pre-signed prescriptions from Defendant PRICHARD's purse.  DEA imaged five office computers and seized cell phones from Defendants ARNOLD, MATA and PRICHARD.

DEA SA Sherrell explained to Defendants MATA and PRICHARD that, as DWFP employees, DEA wanted to interview them individually.  Defendant MATA immediately replied she was a volunteer, not an employee.  SA Sherrell found 3 prescription bottles in Defendant MATA's purse.  One had another individual's name on it for 180 Oxycodone 30mg pills filled at Shopko on May 1, 2017.  SA Sherrell determined 119 pills were missing from the prescription, which was just 2 days old.

1  The second bottle had Defendant MATA's name and was for 120 carisoprodol 350mg

2  pills filled at Shopko on May 1, 2017. SA Sherrell determined that approximately 91

3  pills were missing from this prescription, which was only 2 days old.

4      Defendant PRICHARD stated she was not licensed by the State of Washington

5  as a medical assistant or healthcare provider. Defendant PRICHARD has never

6  worked at another medical office and she performed U/A drug tests and DNA swabs.

7  Regarding the 26 pre-signed blank prescriptions in her purse, defendant PRICHARD

8  stated a few nights ago, Defendant MATA asked defendant PRICHARD to check the

9  office. When PRICHARD arrived, she noticed the back door was unlocked so she

10 entered to check on things, saw the pre-signed prescription paper in the printer,

11 removed it from the printer and took it with her for security reasons.

12     Defendant MATA said she used to work in the optometry field and held no

13 medical assistant or healthcare provider licenses in Washington. Regarding the pre-

14 signed blank prescriptions in Defendant PRICHARD's purse, Defendant MATA

15 recounted Defendant PRICHARD's story. Regarding the missing Soma

16 (Carisoprodol) pills from the bottle in her purse, Defendant MATA initially replied

17 she did not want to get anyone in trouble and then stated she gave the pills to

18 Defendant PRICHARD. Defendant MATA further stated that Defendant ARNOLD

19 verbally gave her permission to issue prescriptions for patients. Defendant MATA

20 stated that Defendant ARNOLD assured her she would not get in trouble for this.

21     SA Sherrell explained to Defendant ARNOLD that DEA was at DWFP because

22 pharmacists and other practitioners made complaints about her prescriptions.

23 Defendant ARNOLD stated they were conspiring against her and she was one of the

24 most experienced and compassionate pain doctors in the area. Defendant ARNOLD

25 stated that at the beginning of the business day, she would make sure there were

26 approximately 30 pre-signed prescriptions in the reception area printer and she would

27 send controlled substance prescriptions to the printer. Defendant MATA would get

28

Plea Agreement- 42

the completed, signed prescription off the printer and add the diagnosis code before handing to the patient.  Defendant ARNOLD said, at the end of the day she locked up any remaining pre-signed prescriptions in her desk drawer.  SA Sherrell asked if this was common medical practice.  Defendant ARNOLD said it is what worked for them at DWFP.  When asked about a Facebook post where Defendant ARNOLD told patients MATA would be in the office on a Saturday for refills, Defendant ARNOLD explained she would have signed the prescriptions on Friday and left them for Defendant MATA to hand out to patients on Saturday.  Defendant ARNOLD said Defendants MATA and PRICHARD had office keys, but not keys to her desk drawer where the pre-signed prescriptions were secure.  When SA Sherrell asked how Defendant PRICHARD would obtain the 26 blank, pre-signed prescriptions in Defendant PRICHARD's purse, Defendant ARNOLD did not know and said Defendant PRICHARD would be fired.  Defendant ARNOLD stated Defendant PRICHARD was a former heroin addict.  Defendant ARNOLD stated she trusted Defendant MATA with her life.

**May 3, 2017 – Search Warrant at MATA's Residence**

DEA seized controlled substance prescriptions for Defendant MATA and an individual identified herein as A., as well as signed prescriptions, pharmacy receipts, and pharmacy-labeled bottles and boxes for herself and six other individuals (identified as A., D.N., PRICHARD, A.M., C.S., and J.R.).  According to DEA agents, there was considerable evidence of drug abuse in Defendant MATA's house, including hundreds of empty fentanyl wrappers and burnt aluminum foil and a homemade pen pipe for smoking controlled substances.

**Sample Text Messages on Defendant ARNOLD's cellular phone**

DEA found the following text messages on Defendant ARNOLD's cell phone.
March 10, 2017 – Defendant ARNOLD texted Defendant MATA, "How are you on signed paper?  Do I need to come in and sign some?"  Defendant MATA replied, "I

Plea Agreement- 43

will message Jen to txt to meet you for paper?  Then when done here I will head to office."  Defendant MATA texted Defendant ARNOLD, "Janet gotta come get paper signed.  Office full of patients.  Can you meet me?"  Defendants ARNOLD and MATA arranged to meet in a veterinary clinic's parking lot.  Defendant MATA texted Defendant ARNOLD that DWFP was so busy it was standing room only.

March 16, 2017 – Defendant ARNOLD sent a text message to Defendant MATA, "Do you think I could have a few Xanax until I can buy some klonopin? Maybe six or so?  Defendant MATA texted she needed a refill because she was overdue and Defendant ARNOLD agreed.  PMP data for patient Defendant ARNOLD indicated no prescriptions for alprazolam (Xanax®).

March 17, 2017 – Text messages indicated Defendant ARNOLD canceled work because of sleep deprivation.

March 23, 2017 – DWFP closed.  Defendant ARNOLD canceled work to supervise an individual not identified herein.  Defendant ARNOLD texted Defendant MATA to do billing and then come out around 5.  Defendant MATA texted, "I will go bill but we also have patients in need of scripts because we did not have enough paper yesterday?"  Defendant ARNOLD texted, "Ok, do we need more paper?"

March 24, 2017 – DWFP closed.  Defendant ARNOLD texted Defendant MATA, "I am totally out of money and food.  If you can come up with $100 for me today, I'd appreciate it."  Defendant MATA texted Defendant ARNOLD, "I can run in later in the day" and "I need paper signed."

March 25, 2017 – Defendant MATA texted Defendant ARNOLD, "Did you need a little money nugget?  I can give you what I made?  I do not want you broke?  I have my food card so we won't go hungry.  I'm worried for you guys to eat?" Defendant ARNOLD texted, " … [T.N.] needs some beer …."  Approximately 4 hours later, Defendant ARNOLD texted Defendant MATA, "Im gonna take a shower in a while then come in to get $$  Will you be home?"  At 9:40 p.m., Defendant ARNOLD texted Defendant MATA that she would come in tomorrow.  At 11:02

Plea Agreement- 44

p.m., Defendant MATA texted Defendant ARNOLD, "That's fine.  I have $80 and Jenn got $40 so I can give you the $80.  Hope that helps ya a bit.  I'm going to sleep in tomorrow then go to work billing at office at some point."

March 27, 2017 – Defendant MATA texted Defendant ARNOLD, "I will go work and do refills and bring ya the money and or groceries?"

March 29, 2017 – Defendant ARNOLD cancelled patients for the day and texted Defendant MATA she accidentally took a Klonopin® with a trazadone and could not even walk.  A few hours later, Defendant ARNOLD texted Defendant MATA, "I'm also in withdrawal, but I'm working on that."  PMP data for Defendant ARNOLD (as patient) indicated her last prescription for clonazepam (Klonopin®) was dispensed on February 29, 2016, for 90 pills for a 90 day supply (1 pill per day).

March 31, 2017 – Defendant ARNOLD texted Defendant MATA, "Can I have 2 or 3 patches tomorrow?  You still owe me 3.  [T.N.] really needs them."  PMP data for Defendant ARNOLD (as patient) indicated the last prescription for fentanyl patches was dispensed on February 29, 2016, for 15 fentanyl 50mcg patches for a 30-day supply (1 patch per 2 days).  For patient T.N., the last prescription for fentanyl patches was dispensed on February 2, 2017 for a 30-day supply.

April 4, 2017 – At 8:57 p.m., Defendant ARNOLD texted Defendant MATA, "Bring 12 diet Pepsi, 12 Budweiser, 12 Mikes."  At 10:07 p.m., Defendant ARNOLD texted MATA, "Bring a few methadone if you can."

April 7, 2017 – At 8:05 a.m., Defendant ARNOLD texted Defendant MATA she was on her fifth Klonopin® with zero sleep and asked Defendant MATA if she wanted to close DWFP for the day.  Defendant MATA texted Defendant ARNOLD that there were patients who needed refills and asked if she could just do a few.  Defendant ARNOLD texted Defendant MATA she was "okay with it" and they were "fucked no matter what."  Defendant MATA texted, "what do you mean?"  Defendant ARNOLD replied, "No, if we're closed, you're staying home.  You're sick!"

Plea Agreement- 45

Defendant MATA texted she was sad for the patients.  Defendant ARNOLD texted, "Go in early.  Cancel the patients.  Put a closed sign up and get home before noon!"

April 11, 2017 – Defendant MATA texted Defendant ARNOLD, "I went back after dropping u off and did Jessica R rxs I have your 20 bucks."

April 26, 2017 – Defendant ARNOLD texted Defendant MATA, "are you coming out for some meds?  Do you want to meet part way?"

April 27, 2017 – Defendant ARNOLD texted Defendant MATA, "I don't know if you saw it, but [T.M.] gave me a new dab rig today.  More high-tech that the last one.  That's why I didn't charge him."

April 28, 2017 – Defendant ARNOLD texted Defendant MATA, "I'm not awake.  [T.N.'s] not awake.  Can you handle today?"  Defendant MATA replied, "Yes, I need paper signed."

April 29, 2017 – Defendant ARNOLD texted an individual identified herein as T.M., "It's Janet.  I tried your rig.  1 toke was all it took."  T.M. replied, "Ya that batch I gave you had about 5 to 6 kinds in it all 100 a gram and cured over couple months over in warm place.  Glad you liked it."  Defendant ARNOLD replied, "It's awesome.  Thank you again."

May 1, 2017 – Defendant ARNOLD texted an unknown number, "Closed today due to illness.  Please reschedule.  Dr. A."  Defendant ARNOLD also texted [J.R.], "We are closed today, but I think Danielle's working."  Defendant ARNOLD texted Defendant PRICHARD, "closed today" and Defendant MATA, "Try to move Monday patients to Wed."

**Sample of Conversations/Recordings on Defendant MATA's cellular phone**

DEA found conversations between Defendants MATA and ARNOLD on Defendant MATA's cell phone.  For example, between April 25, 2016 and April 27, 2016, Defendants MATA and ARNOLD discussed a female patient that Defendant ARNOLD acknowledged may be selling her pills and issues with L.S.'s referral patients.  Defendant MATA told Defendant ARNOLD she really did not want to get

Plea Agreement- 46

rid of our patients because 70% may be fraudulent.  Defendant ARNOLD, replied, "maybe."  Defendant ARNOLD told Defendant MATA she needed to "break Patrick" who stopped filling prescriptions.  Agents found conversations occurring on May 19, 2016, where Defendant MATA woke Defendant ARNOLD up to notify her that Defendant Lisa [COOPER] was going to  trade Fentanyl patches with Defendant MATA (Mallinckrodt for Gel).  Defendant MATA stated that Defendant COOPER would leave them in Defendant MATA's van.  Defendant MATA told Defendant ARNOLD to take two Methadone in an hour.  Defendant MATA told Defendant ARNOLD that she did not want her to get sick.  Defendant ARNOLD replied that she already took a Fentanyl.

**Text Messages Between Defendant MATA and DAVID BARNES NAY**

Once Defendant MATA began working at DWFP, NAY started contacting her directly to obtain controlled substances for himself and at least eight other individuals (identified herein as N.L., R.I., R.S., C.S., J.M., K.Y., P.S., and S.R.).  Defendant ARNOLD's practice of pre-signing blank prescription forms and allowing Defendant MATA, her office manager, to fill in the other required information -- to include drug type, dosage, and quantity -- caused Schedule II controlled substances to be distributed and dispensed to these individual without a legitimate medical purpose and outside the usual course of professional practice.

Using blank prescription forms pre-signed by Defendant ARNOLD and provided by Defendant ARNOLD, Defendants MATA and ARNOLD created 36 prescriptions in NAY's name and 131 prescriptions in the names of N.L., R.I., R.S., C.S., J.M., K.Y., P.S., and S.R.  The 131 prescriptions totaled 1,940 Carisoprodol 350mg tablets, 775 Fentanyl patches (25mcg – 100mcg), and 8,760 Oxycodone pills (5mg – 30mg).

March 22, 2016 – Defendant MATA texted NAY, "[I']m going to print scripts without [J]anet. Do u want me to print you anything?"  NAY replied, "Yes please.

My oxys and patches and ridlin … one month and three month if possible.  I was going to talk to her this well three month though."  According to PMP data, NAY filled three prescriptions on March 22, 2016, for 180 Methylphenidate ER 20mg (Ritalin) tablets, 45 Fentanyl 100mcg patches, and 270 Oxycodone 20mg tablets. According to PMP data, between March 22, 2016, and April 15, 2017, 36 "prescriptions" were issued in NAY's name for:  225 Fentanyl 100mcg patches; 2,100 Oxycodone 20 mg tablets; 660 Methylphenidate 20mg tablets; 840 Carisoprodol 350mg tablets; and 420 Alprazolam 1mg/2mg tablets.

May 26, 2016 – Defendant MATA texted NAY, "When is [N.] due" followed by "I have some pre-signed scripts."[7]  NAY replied, "Not for a grip … I've got someone else on deck."  Defendant MATA replied, "[N.] should be due."  Defendant MATA and NAY exchanged several messages trying to determine when "[N.]" was due for a prescription refill.  When Defendant MATA asked NAY for N.'s last name, NAY provided it.  Defendant MATA texted NAY she planned to "up" [N].  Defendant MATA and NAY exchanged several text messages regarding prescriptions for N.L. as they became "due" for renewal.   PMP data indicated N.L. filled 19 prescriptions between May 4, 2016, and November 11, 2016, for 180 Carisoprodol 350mg tablets, 30 Fentanyl 50mcg patches, 90 Fentanyl 100mcg patches, 360 Oxycodone 15 mg tablets, and 1,140 Oxycodone 20 mg tablets.

May 26, 2016 – Defendant MATA texted NAY she needed to make money and asked who the other person was.  NAY texted R.I.'s name, DOB and address to Defendant MATA.  NAY indicated R.I. had Medicare Insurance to help cover the prescription.  PMP data indicates on May 27, 2016, R.I. received a prescription for 120 oxycodone 10mg tablets.  Defendant MATA texted NAY to leave her "cut" under a seat in her van.  Defendant MATA and NAY exchanged text messages making sure

---

[7] This individual is identified as N.L.

Plea Agreement- 48

N.L. and R.I. have their stories straight for the pharmacy. They also exchange texts as the prescriptions become "due" for renewal.

June 1, 2016 – Defendant MATA texted NAY they should add fentanyl patches for R.I. On June 6, 2016, Defendant MATA texted NAY she would print off prescriptions for R.I. and leave them in her van at DWFP. R.I. received prescriptions for oxycodone and fentanyl on that date.

PMP data shows R.I. filled 25 prescriptions between May 28, 2016 and April 3, 2017 for 240 Carisprodol 350mg tablets, 15 Fentanyl 50mcg patches, 135 Fentanyl 100mcg patches, 120 Oxycodone 10mg tablets, 300 Oxycodone 15mg tablets, and 1,620 Oxycodone 20mg tablets.

June 27, 2016 - NAY texted R.S.'s name, DOB, and address to Defendant MATA to use for prescriptions. NAY asked Defendant MATA to prescribe R.S. 180 Oxycodone 10mg pills and Fentanyl 50mcg patches. PMP data reveals that on June 27, 2016, and June 28, 2016, R.S. received a prescription for 180 Oxycodone 10mg pills and 15 Fentanyl 50mcg patches. PMP data for the period June 28, 2016, and April 28, 2017, R.S. filled 18 prescriptions for 320 Carisprodol 350mg tablets, 75 Fentanyl 50mcg patches, 30 Fentanyl 75mcg patches, 540 Oxycodone 10mg tablets, 720 Oxycodone 15mg tablets, and 90 Oxycodone 30mg tablets.

July 6, 2016 – NAY texted C.S.'s name, DOB, and address to Defendant MATA to use. NAY asked, "You got a time frame on the paperwork? I've got my people here and ready." Defendant MATA replied she was "slammed" at the office and asked NAY to hang on. PMP data shows that on July 7, 2016, C.S. received three prescriptions for 15 Fentanyl 50mcg patches, 60 Carisprodol 350mg tablets, and 180 Oxycodone 15mg tablets. PMP for the period July 7, 2016, to April 18, 2017, show C.S. filled 22 prescriptions for 450 Carisoprodol 350mg tablets, 30 Fentanyl 50mcg patches, 90 Fentanyl 75mcg patches, 1,440 Oxycodone 15mg tablets, and 120 Oxycodone 20mg tablets.

August 2, 2016 – Defendant MATA texted NAY that she did not want to add any other people. Defendant MATA asked NAY if she could create a prescription in his name for Soma (Carisoprodol) and then immediately delete it from the DWFP computer. NAY asked Defendant MATA if she could throw in a prescription for Xanax® (Alprazolam) for him because he was due. PMP shows NAY received two prescriptions dated August 2, 2016, for 60 Carisoprodol 350mg tablets and 60 Alprazolam 1mg tablets.

August 15, 2016 – NAY texted K.Y.'s name, DOB, and address to Defendant MATA to use. NAY indicated Defendant MATA could "stack her up" even though it had been one year since K.Y.'s last prescription. Defendant MATA replied they would have to start low. PMP shows K.Y. received two prescriptions dated August 15, 2016, for 15 Fentanyl 25mcg patches, and 120 Oxycodone 10mg tablets. PMP for the period August 15, 2016, to April 26, 2017, K.Y. filled 22 prescriptions for 330 Carisprodol 350mg tablets, 15 Fentanyl 25mcg patches, 30 Fentanyl 50mcg patches, 90 Fentanyl 75mcg patches, 120 Oxycodone 10mg tablets, 840 Oxycodone 20mg tablets, 60 Oxycodone 30mg tablets, and 120 Hydromorphone 4mg tablets.

September 13, 2016 – Defendant MATA texted NAY, "David make sure you get the somas filled. Then im going to give that chick some and go get the patches. That pharmacy closes at 6pm. So get as soon as you get the money from Jeremy so I can make it to pharmacy with chick by 6. Okay?" NAY replied, "What's the bottom dollar on the 30s?" PMP shows NAY received 4 prescriptions dated September 13, 2016, for 60 Carisoprodol 350mg tablets, 180 Methylphenidate 20mg tablets, 45 Fentanyl 100mcg patches, and 540 Oxycodone 20mg tablets.

September 16, 2016 – NAY texted Defendant MATA, "I can drop this sixty and the other 140 at eleven in the morning and that will be 9 on those. But … I have like 12 extra ones so that will be about 70 more." Defendant MATA asked, "9$ on 20mg?" NAY replied, "No they all gonna go 12ea. 170x12=2040. 2040-250 for the

Plea Agreement- 50

copay=1790. 1790/2=895. But my count is fucked up so itll be 75ea more. That's the breakdown on the 20s and I gave you 700 total today."

September 16, 2016 – NAY texted Defendant MATA, "Okay heres the low down on [P.] [P.S.] xxxxxx09 He'll be needin amitriptyline 10mg 2xdly hrs already on hydro tens but can go to patches and oxys. You can give him Xanax and soma. He only wants the amitriptyline and money. You can get the somas and I'll sell the xans and split between me and you and he can have the amitriptyline. Then it's the same ol story with the patches and oxys."

NAY gave P.S.'s name, DOB and address to Defendant MATA. Defendant MATA replied she would go in early the next day to do the prescriptions. Defendant MATA told NAY she could not prescribe Soma and Xanax® at the same time because DEA would review it. PMP shows P.S. received 3 prescriptions dated September 19, 2016, for 15 Fentanyl 25mcg patches, 90 Carisprodol 350mg tablets, and 120 Oxycodone 15mg tablets. PMP for the period September 19, 2016, to December 1, 2016 shows P.S. filled 9 prescriptions for 330 Carisoprodol 350mg tablets, 30 Fentanyl 25mcg patches, 15 Fentanyl 50mcg patches, and 360 Oxycodone 15mg tablets.

September 26, 2016 – Defendant MATA texted NAY asking what was wrong with K.Y. NAY replied K.Y. had a "permanently damaged lower back." PMP shows K.Y. received 2 prescriptions dated September 26, 2016, for 120 Oxycodone 15mg tablets and 15 Fentanyl 50mcg patches.

November 25, 2016 – Defendant MATA texted NAY, "they are in my van." NAY texted Defendant MATA, "Sonny" was not available yet. On November 26, 2016, Defendant MATA texted NAY, "Any word on sonny?' PMP shows S.R. received 2 prescriptions, dated November 25, 2016, for 15 Fentanyl 50mcg patches and 150 Oxycodone 15mg tablets. PMP for the period October 18, 2016, to April 3, 2017, shows S.R. received 14 prescriptions for 90 Carisoprodol 350mg tablets, 10 Fentanyl 25mcg patches, 60 Fentanyl 50mcg patches, 15 Fentanyl 75mcg patches 120

Oxycodone 5mg tablets, 120 Oxycodone 10mg tablets, and 750 Oxycodone 15mg tablets.

**Text Messages Between Defendants MATA and COOPER on Defendant MATA's cellular phone**

Text messages reveal that prescriptions Defendant MATA created for K.M., S.F., and C.L. included a kickback payment to Defendants MATA and COOPER. K.M., who was an existing DWFP patient, paid Defendants COOPER and MATA a kickback of 3 Fentanyl patches and 40 Oxycodone pills per prescription. K.M. could keep the rest. S.F. and C.L., who were not DWFP patients, were required to kickback a higher percentage of the Fentanyl patches and Oxycodone pills generated by their prescriptions. Prescriptions created for Defendant COOPER and C.C. apparently did not involve a kickback payment to Defendant MATA; however, text messages indicated Defendant COOPER sold Fentanyl patches and Oxycodone pills she received from Defendant ARNOLD and from pre-signed prescriptions from Defendant MATA, and sometimes used C.C.'s prescriptions to replenish the drugs she sold. Defendant COOPER also sold Fentanyl patches and Oxycodone pills on Defendant MATA's behalf for a 10% fee.

Between late March 2016 and May 3, 2017, Defendant COOPER and her associates received approximately 173 prescriptions bearing Defendant ARNOLD's signature for: 920 Fentanyl patches; 9,355 Oxycodone pills; 900 Amphetamine pills; 1,050 Carisoprodol pills; 1,020 Alprazolam pills; and 78 Phentermine pills.

On March 19, 2016, Defendant COOPER notified Defendant MATA she had a female friend who would allow Defendants MATA and COOPER to use her name to create a prescription in exchange for 5 Fentanyl patches and 30 Oxycodone pills. The next day, Defendant COOPER offered to sell Defendant MATA Oxycodone pills and inquired how much of Defendant ARNOLD's prescription paper was available. Defendant COOPER texted Defendant MATA, "Is she out of script paper because I need some scripts printed off?" Between March 24, 2016, and March 25, 2016,

Plea Agreement- 52

Defendant COOPER texted Defendant MATA, "Do you have any patches to sell I have someone who wants 2 for $150." Defendant MATA referred Defendant COOPER to NAY to purchase Fentanyl patches. On March 28, 2016, Defendants MATA and COOPER discussed street prices for Oxycontin 80mg pills. Defendants MATA and COOPER also arranged to trade Fentanyl patches for Oxycodone 15mg pills, using Defendant MATA's mailbox as a dead-drop location. Defendant COOPER texted Defendant MATA that she does not "snort" the "oxys" rather she "chews" them. Defendant COOPER texted Defendant MATA, "I need mine for three months and [C.C.] needs his for two months because he is going back to school in Vegas ... I will be at [DWFP] tomorrow to get [C.C.] scripts ... I will text janet tomorrow because I also want to get mine." Defendant MATA texted Defendant COOPER, "will you be able to pay me patch back in next couple days if my sister don't get out of hospital to pay me back patches. I'm not stressing it bad but I don't want to go without." On March 30, 2016, Defendant COOPER texted Defendant MATA, "Can you call I will buy some from him to pay you back" and "It was [L.S.] on the other line I am trying to get some from him now." Defendant MATA replied, "his are gel. Better than nothing." On April 11, 2016, Defendant COOPER offered to broker a drug deal with Defendant MATA for Fentanyl patches for $100 each and involving T.M..

On May 27, 2016, Defendant MATA texted Defendant COOPER she would stop printing [C.C.'s] prescriptions because "it's not worth me doing it. And then if I don't he will call janet then he can go thru her. Its not eventually I will be called on it by janet. For favors. I have printed his scripts and upped his doses and gave early upped his quantity so its not worth me doing it. I do it for [K.M.] also. So don't need him saying he is going to janet because I'm not jumping to do this. He can make appointment if he wants." Defendant COOPER texted Defendant MATA, "I would not expect you to do sh[i]t for free. Like I say Felonies are not FREE ..." On June

Plea Agreement- 53

20, 2016, Defendants COOPER and MATA renegotiated Defendant MATA's fee for prescriptions for K.M. and C.L.  On August 10, 2016, there are a series of text messages between Defendants MATA and COOPER regarding a meeting at DWFP at 1:40 a.m. so Defendant COOPER could get a prescription for Schedule II and IV controlled substances.

The investigation revealed that C.L. N.L., P.S., J.M., C.S., K.Y., R.S., S.F., and K.S. were not DWFP patients yet prescriptions for Schedule II controlled substances bearing Defendant ARNOLD's signature were issued.  It also revealed that K.M., R.I., M.A., and S.R. were prior patients and there were chart notes for those patients.  For example, K.M. was seen by Defendant ARNOLD on October 12, 2015, as a new pain management patient.  Records reveal a follow up visit with Defendant ARNOLD on November 11, 2015 marked as "pending" with no chart notes.  No other visits were recorded by Defendant ARNOLD.  K.M. has an extensive Schedule II controlled substance prescription history in 2016 and 2017 but no documented visits with Defendant ARNOLD.  R.I. was seen by Defendant ARNOLD a few times in 2014.  R.I. has an extensive Schedule II controlled substance prescription history in 2016 and 2017 but no documented visits with Defendant ARNOLD.  Records indicate S.R. was seen by Defendant ARNOLD on January 20, 2015; however, it appears the chart note may have been cut and pasted because it references a female patient.  S.R. is a male.  No other visits are documented by Defendant ARNOLD; however many Schedule II controlled substance prescriptions were issued to S.R. in 2016 and 2017.  Medical records indicate C.C. was established by Defendant ARNOLD as a new pain management patient on June 16, 2015, but with no chart notes.  A majority of C.C.'s subsequent visits contain no chart notes even though Defendant ARNOLD prescribed Fentanyl and Oxycodone for pain.  On February 10, 2017, Defendant ARNOLD increased from Fentanyl 75mcg patches to Fentanyl 100mcg patches for C.C. but there are no supporting chart notes.

//

**Text Messages Between Defendant MATA and R.B.**

DEA received two cellular phones from the Washington DOH Medical Board that belonged to R.B., a former patient of Defendant ARNOLD. R.B. died in in June 2016. DEA's analysis of information recovered from R.B.'s phones during the period November 15, 2015, and June 18, 2016, showed numerous contacts (330 text messages, 101 calls) with Defendant MATA's phone. Many were drug-related. For example, on November 15, 2015, R.B. texted Defendant MATA, "Know anyone got patches." Defendant MATA replied, "Nobody. I will send text out." On March 20, 2016, Defendant MATA texted R.B., "I will meet up with you to give you zanies tomorrow." R.B. replied, "You don't happen to have any patches do you?" Defendant MATA texted, "I might be able to work out a deal with you." On April 1, 2016, R.B. texted Defendant MATA, "Have him put in mailbox." On May 1, 2016, Defendant MATA texted R.B., "I'm heading to prosser to sell to lisa." On May 2, 2016, Defendant MATA texted R.B., "I've been selling my meds to make my house payment. I got someone who is buying yours and they were ready but can't pick up till she changes codes. So sorry it's taken so long. She closed office today and been trying to track her down. This chick had all the money for yours but doc needs to initial and change I can't. … I would just pick up oxys for you but they have wrong codes!" R.B. replied "yeah take oxys let me know when thank you … it is time." Defendant MATA texted, "They are in mailbox." On May 15, 2016, Defendant MATA texted R.B., "I got zanies. I'm going to put the ones I got you in mailbox. Remember doc is staying here so be very discrete. Please. Wait like 40 min. She is in living room." On May 18, 2016, Defendant MATA texted R.B., "Everyone is filling their scripts out of town because she has been blackballed here." On May 20, 2016, R.B. texted Defendant MATA, "Scripts there." Defendant MATA replied, "Scripts there but dr has to show the fuck up to do the codes. I can't sign the codes. She has to. She isn't scheduled to be back till Monday so I went in to meet key

people and she said she would meet me and never showed up.  So I went home to get her . . . .   So her and I got in argument and she locked herself in room and that's where she has stayed until she comes out to shit.  Yours are in a stack of about 18 others."  R.B. replied, "oh fuck."  R.B. texted, "I wanna get [A.M.'s] also.  Im afraid her license will be pulled before we gettem all!  Fuck."  On June 15, 2016, R.B. texted Defendant MATA, "Are you going to get scripts for me?"  Defendant MATA replied, "Yea remember we have to wait till 2 days early … I will call ya when I gotta printed."

   7.  <u>The United States Agrees:</u>

      (a)  <u>To Dismiss Counts:</u>

   At the time of sentencing, the United States agrees to move to dismiss Counts 5, 7 through 17, 19 through 25, 31 through 43, 45, 46, 48 through 55, and 58 through 63 and 65, which charge Defendant with knowingly and intentionally distributing and dispensing, and causing to be distributed and dispensed, a mixture and substance containing a detectable amount of a Schedule II controlled substance (Oxycodone, Fentanyl) and Counts 29, 30, 44 and 47 which charge Defendant with knowingly and intentionally distributing and dispensing, and causing to be distributed and dispensed, a mixture and substance containing a detectable amount of a Schedule IV controlled substance (Carisoprodol), by issuing "prescriptions" without a legitimate medical purpose and outside the usual course of professional practice, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), (b)(2), 21 C.F.R. § 1306.04, and 18 U.S.C. § 2.

      (b)  <u>Not to File Additional Charges:</u>

   The United States Attorney's Office for the Eastern District of Washington agrees not to bring any additional charges against Defendant based upon information in its possession at the time of this Plea Agreement and arising out of Defendant's conduct involving illegal activity charged in the Superseding Indictment or this investigation, unless Defendant breaches this Plea Agreement any time before sentencing.

Plea Agreement- 56

> (c) <u>Not to File Information for Penalty Enhancement:</u>

The United States agrees not to file an enhanced penalty information to establish Defendant's prior felony drug conviction pursuant to 21 U.S.C. § 851.

> 8.   <u>United States Sentencing Guideline Calculations:</u>

Defendant understands and acknowledges that the United States Sentencing Guidelines (hereinafter "USSG") are applicable to this case and that the Court will determine Defendant's applicable sentencing guideline range at the time of sentencing.

> (a) <u>Base Offense Level:</u>

The parties agree and stipulate that Defendant's base offense level is 32.  USSG § 2D1.1(c)(4).

> (b) <u>Specific Offense Characteristics:</u>

The parties agree and stipulate that they will not seek any specific offense characteristics or adjustments.

> (c) <u>Aggravating Role:</u>

The parties agree and stipulate that Defendant's base offense level should be increased 4-levels because Defendant was an organizer and leader of criminal activity that involved five or more participants or was otherwise extensive.  See USSG § 3B1.1(a).

> (d) <u>Multiple Count Analysis:</u>

Pursuant to USSG § 3D1.2(d), the parties agree that Counts 1, 4, 6, 18, 56, 57 and 64 are to be grouped because the offense level is determined largely on the basis of the total quantity of the controlled substances involved.

> (e) <u>Acceptance of Responsibility:</u>

If Defendant pleads guilty and demonstrates a recognition and an affirmative acceptance of personal responsibility for the criminal conduct; provides complete and accurate information during the sentencing process; does not commit any obstructive conduct; accepts this Plea Agreement; and enters pleas of guilty on December 6, 2018,

Plea Agreement- 57

the United States will move for a 3-level downward adjustment in the offense level for Defendant's timely acceptance of responsibility, pursuant to USSG § 3E1.1(a) and (b).

The parties agree that the United States may, at its option and upon written notice to Defendant, not recommend a 3-level reduction for acceptance of responsibility if, before sentencing, Defendant is charged or convicted of any criminal offense whatsoever, or if Defendant tests positive for any controlled substance.

(f)  Criminal History:

The parties make no agreement on Defendant's criminal history category, which shall be determined by the Court after the Presentence Investigative Report is completed.

9.   Incarceration:

The Defendant acknowledges that the United States will be recommending a sentence at the low-end of the advisory range.  The Defendant is free to recommend any legal sentence.

10. Criminal Fine:

The parties are free to make whatever recommendation concerning the imposition of a criminal fine that they believe is appropriate.

11. Supervised Release:

The parties agree to recommend that the Court impose a 5-year term of supervised release.  The parties are free to advocate for any special conditions they believe are appropriate.

12. Mandatory Special Penalty Assessment:

Defendant agrees to pay the $700 mandatory special penalty assessment to the Clerk of Court for the Eastern District of Washington.  *See* 18 U.S.C. § 3013.

13. Payments While Incarcerated:

If the Defendant lacks the financial resources to pay the monetary obligations imposed by the Court, then Defendant agrees to earn the money to pay toward these

obligations by participating in Bureau of Prisons' Inmate Financial Responsibility Program.

14. <u>Additional Violations of Law Can Void Plea Agreement</u>:

The parties agree the United States may at its option and upon written notice to Defendant, withdraw from this Plea Agreement or modify its recommendation for sentence if, before sentencing, Defendant is charged or convicted of any criminal offense whatsoever, or if Defendant tests positive for any controlled substance.

15. <u>Appeal Rights</u>:

Defendant understands that she has a limited right to appeal or challenge the conviction and sentence imposed by the Court. Defendant hereby expressly waives her right to appeal her conviction and sentence. Defendant further expressly waives her right to file any post-conviction motion attacking her conviction and sentence, including a motion pursuant to 28 U.S.C. § 2255, except one based upon ineffective assistance of counsel based on information not now known by Defendant and which, in the exercise of due diligence, could not be known by Defendant by the time the Court imposes the sentence.

16. <u>Integration Clause</u>:

The parties acknowledge that this document constitutes the entire Plea Agreement between the parties, and no other promises, agreements, or conditions exist between the parties concerning this case's resolution. This Plea Agreement is binding only upon the United States Attorney's Office for the Eastern District of Washington, and cannot bind other federal, state, or local authorities. The parties agree that this agreement cannot be modified except in writing that is signed by the United States and Defendant.

<u>Approval and Signature</u>

Agreed and submitted on behalf of the United States Attorney's Office for the Eastern District of Washington.

Plea Agreement- 59

Joseph H. Harrington
United States Attorney

*Richard C. Burson For:*                                    12/28/18
George J.C. Jacobs III                                      Date
Assistant United States Attorney

I have read this Plea Agreement and have carefully reviewed and discussed

every part of the agreements with my attorney.  I understand and voluntarily enter into

the Plea Agreement.  Furthermore, I have consulted with my attorney about my rights,

I understand those rights, and I am satisfied with the representation of my attorney in

this case.  No other promise or inducements have been made to me, other than those

contained in this Plea Agreement and no one has threatened or forced me in any way

to enter into this Plea Agreement.  I am agreeing to plead guilty because I am guilty.

DANIELLE CORINE MATA                                        12/28/18
Defendant                                                   Date

I have read the Plea Agreement and have discussed the contents of the

agreement with my client.  The Plea Agreement accurately and completely sets forth

the entirety of the agreement between the parties.  I concur in my client's decision to

plead guilty as set forth in the Plea Agreement.  There is no legal reason why the

Court should not accept Defendant's pleas of guilty.

Nicholas Marchi                                             12/28/18
Attorney for Defendant                                      Date

Plea Agreement- 60